Mark Edward GARDNER *v*. STATE of Arkansas

CR 86-163                                     754 S.W.2d 518

Supreme Court of Arkansas
Opinion delivered June 20, 1988

46

*Pruitt & Hodnett*, by: *Roger T. Jeremiah*, for appellant.

*Steve Clark*, Att'y Gen., by: *Clint Miller*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. Appellant Mark E. Gardner was charged with two counts of capital murder in connection with the December 1985 strangulation deaths of Joe and Martha Joyce and the Joyces' daughter, Sara McCurdy. Gardner was convicted and sentenced to death by lethal injection on both

counts. Twenty-one points are raised on appeal. With few exceptions, we will treat each point separately. In addition to the points argued by Gardner, we have examined all other objections made during the trial in accordance with Rule 11(f) of the Rules of the Supreme Court and the Court of Appeals. Finding no error, we affirm.

Shortly after 2:00 p.m. on December 12, 1985, the bodies of Mr. and Mrs. Joyce and Sara McCurdy were discovered in the Joyce residence in Fort Smith, Arkansas. Mr. Joyce was found in one room tied to a chair with his own neckties. His feet had been bound and he had been gagged. A necktie was wrapped about his neck so tightly that it had to be cut free. Mrs. Joyce was found bound and gagged in one of the bedrooms. At the trial, the medical examiner testified that Mr. and Mrs. Joyce died of strangulation. Sara McCurdy was found in another bedroom with a belt wrapped around her neck. She too had been bound and gagged. Additionally, a coat hanger had been twisted about her neck. She was taken to a local hospital with the expectation that she might be revived but was pronounced dead on arrival. The cause of death was strangulation. At trial, the State produced evidence that Sara McCurdy had been raped.

Cindy Griggs — Sara McCurdy's sister and co-worker — testified that an inventory of the items in her parents' home revealed that a bag of silver coins, money, knives, a purse, binoculars, and numerous pieces of jewelry were missing. The witness described the knives, purse, binoculars, and jewelry with particularity.

Additional testimony by other witnesses developed the following. Sara McCurdy had left work at 11:15 a.m. on December 12 to drop off her car, a 1977 Buick LaSabre, at her parents' home. It had been planned that Mr. Joyce would take Sara back to work after lunch, but she never returned. Calls to the Joyce residence between 12:30 and 2:00 went unanswered. Subsequently, the victims' bodies were discovered by a relative. It was determined at that time that Sara McCurdy's car was missing.

Earlier on December 12, at approximately 3:30 a.m., Gardner had checked into the Regal 8 Inn in Fort Smith. Shortly before 11:00 a.m. he was seen walking in the direction of May

Avenue in Fort Smith. Between 11:00 and 11:30, in a shop on May Avenue, Gardner asked for directions to Linwood Street. The directions given would have taken him within one block of the Joyce residence. The next time Gardner was seen was shortly before 2:00 p.m. near Pocola, Oklahoma. He was driving a 1977 Buick LaSabre later found abandoned near Pocola and identified as belonging to Sara McCurdy.

The abandoned vehicle had been left near a service station where Gardner obtained a ride to the Fort Smith bus station. He was described as carrying a purse matching the description of the one taken from the Joyce residence. From Fort Smith, Gardner took the bus to Little Rock. At the Little Rock bus station, he attempted to sell numerous pieces of jewelry and several silver coins to persons who testified for the State at trial and described the jewelry and coins in detail. After his arrival in Little Rock, Gardner checked into the Downtowner Motor Inn and on December 13 he pawned some of the jewelry at Maxie's Pawn Shop in Little Rock.

Based upon a description of Gardner and information that he was trying to pawn jewelry in Little Rock and obtain a ride to Fort Smith, undercover Arkansas State Police officers went to the Little Rock bus station in an unmarked vehicle and offered Gardner a ride to Fort Smith if he would pay for the gas. Gardner agreed. He was arrested in route to Fort Smith at a point near Clarksville. On that same day, officers obtained custody of the jewelry that had been pawned at Maxie's in Little Rock. That jewelry was taken to Clarksville where it was identified by Cindy Griggs as the jewelry missing from her parents' home.

On December 14, the police searched Gardner's room at the Downtowner Motor Inn in Little Rock pursuant to a warrant. The search produced several items later identified as having been taken from the Joyce residence. On December 16, one of the officers returned to the Downtowner Inn and took custody of certain items seen but not seized during the original search. These items had been removed and secured by employees of the Inn. Among those items was the purse Gardner had been carrying near Pocola which had belonged to Mrs. Joyce.

## I. VENUE

Gardner filed a pretrial motion for change of venue on the grounds that he could not receive a fair and impartial trial in Sebastian County. In support of his motion, Gardner introduced testimony by individuals associated with the news media who described the coverage the triple homicide had received. Gardner also introduced testimony by four witnesses who stated that they did not believe Gardner could get a fair trial in the county. The motion for change of venue was denied.

The record reveals that the Joyce and McCurdy murder investigation was a "lead" story at least on the day the crime was discovered and possibly one to two days thereafter. However, the primary coverage received by the event ended within approximately five days. During that period and afterwards, the news media broadcast not only pictures of Gardner but also information concerning: (1) the scene of the murders, including speculation on how the murders were committed; (2) the items allegedly found on Gardner and speculation that they had been taken from the Joyce residence; (3) charges against Gardner in Illinois involving his alleged breaking and entering a home, blindfolding the occupants, raping the female occupant at knifepoint, and taking money; (4) statements made by Gardner to the undercover officers in route to Fort Smith that he was possessed by demons, had a gun, would kill the officers if they "messed" with him or should it turn out that they were police officers, that he had killed someone in Chicago, wanted to kill a pawn broker in Little Rock, and was going to obtain cocaine in Fort Smith; (5) statements to a bus station employee that Gardner had killed a woman and had taken her jewelry; and (6) Gardner's record from another state and that he was paroled from prison.

In response to Gardner's motion, the State introduced twelve affidavits and presented the testimony of five witnesses to the effect that Gardner could receive a fair trial in the county. The testimony of those witnesses generally indicated that they remembered little if anything about the crime, or that what little they remembered would not affect their ability to give Gardner a fair trial. The State also cross-examined several of appellant's witnesses — many of whom stated that notwithstanding the coverage received by the event, they had conversed with few

persons, if any, who had recently even mentioned the crime. Those witnesses who were members of the news media stated that there was nothing about the coverage that would prevent them from giving Gardner a fair trial and that they had not formed an opinion on his guilt or innocence.

A change of venue should be granted only when it is clearly shown that a fair trial is not likely to be had in the county. *Berry* v. *State*, 290 Ark. 223, 718 S.W.2d 447 (1986). The burden of proof is on the defendant, and the decision of the trial judge will be upheld unless it is shown that there was an abuse of discretion in denying the motion. *Kirkendall* v. *State*, 265 Ark. 853, 581 S.W.2d 341 (1979). We have emphasized the significance of the trial court's opportunity to observe the witnesses, and have held that those witnesses who state that the appellant cannot receive a fair trial must be able to show that they either have a general knowledge as to the state of mind of the inhabitants of the whole county or that they are cognizant of prejudice existing throughout the whole county. *Hill* v. *State*, 275 Ark. 71, 628 S.W.2d 284 (1982).

We have also held that it is not necessary that jurors be totally ignorant of the facts surrounding the case, as long as they can set aside any impression they have formed and render a verdict solely on the evidence at trial. *Swindler* v. *State*, 264 Ark. 107, 569 S.W.2d 120 (1978), *cert. denied*, 449 U.S. 1057 (1980). There can be no error in the denial of a change of venue if an examination of the jury selection shows that an impartial jury was selected and that each juror stated he or she could give the defendant a fair trial and follow the instructions of the court. *Perry* v. *State*, 277 Ark. 357, 642 S.W.2d 865 (1982).

While there are elements of this case resembling those before this court in *Ruiz & Van Denton* v. *State*, 265 Ark. 875, 582 S.W.2d 915 (1979), *cert. denied*, 454 U.S. 1093 (1981), we conclude that Gardner failed to show that a fair trial was not likely to be had. We therefore find no abuse of discretion by the trial court.

First, a review of the news coverage in this case — when combined with the testimony of the witnesses — suggests that any prejudicial effect as to the manner in which the story was covered was either dissipated by the passage of time between the crime

and the subsequent trial, or was never so severe as to affect the minds of the inhabitants of the county. Second, none of the witnesses presented on Gardner's behalf exhibited a general knowledge as to the state of mind of all those living in Sebastian County or stated that they were cognizant of prejudice existing throughout the whole county. Finally, each person eventually seated as a juror in the case stated that he or she would be able to give Gardner a fair trial and follow the instructions of the court. Accordingly, we find no error on this point.

## II. PRETRIAL TRANSCRIPTS

At the pretrial stage, Gardner requested transcripts of all pretrial proceedings on the grounds that it "may be necessary . . . to use some of the testimony . . . for impeachment purposes at the trial." The request was denied. Gardner later renewed the request as to portions of the pretrial proceedings contending that the defense "would like to be able to quote the witnesses verbatim in case their testimony varies during the trial." The trial court again denied the request.

At trial, Gardner raised the issue a third time when testimony of a State's witness regarding her ability to identify Gardner as the individual in Sara McCurdy's vehicle near Pocola varied from her previous testimony during a pretrial hearing. Once again, the court denied the request.

On appeal, Gardner argues that he was denied effective assistance of counsel and the right to confront witnesses against him. As to the first point, Gardner failed to make the argument below. *Barnes* v. *State*, 294 Ark. 369, 742 S.W.2d 925 (1988). As to the second point, with the exception of *Graves v. State*, 256 Ark. 117, 505 S.W.2d 748 (1974), cited in Gardner's reply brief, no authority is given for the proposition that transcripts of pretrial proceedings *must be* furnished merely because the defense "might" impeach the credibility of the State's witnesses at trial *in the event the occasion to do so should arise.*

While there is mention in *Graves* of the benefit associated with a defendant's access to transcripts of pretrial proceedings, our decision in that case is clearly distinguishable from the facts before us now. Our comments in *Graves* simply emphasized that when a court fails to provide the defendant with counsel at a

preliminary hearing, evidence that the defendant had access to transcripts of the hearing was relevant on the issue of whether defendant was prejudiced by the error in not appointing counsel. Here, Gardner does not contend that he did not have pretrial counsel. In any event, *Graves* did not create an affirmative obligation with respect to providing access to pretrial transcripts. Additionally, at the time of our decision in *Graves*, error was presumed prejudicial in the absence of an affirmative showing to the contrary — a rule which this court no longer follows. *Sutherland* v. *State*, 292 Ark. 103, 728 S.W.2d 496 (1987).

■ Nonetheless, we do find decisions from the United States Supreme Court which indicate that the State must provide an indigent defendant with a transcript of pretrial proceedings when that transcript is needed for an effective defense. *Britt* v. *North Carolina*, 404 U.S. 226 (1971); *Roberts* v. *LaVallee*, 389 U.S. 40 (1967). In each case, the focus has been on whether the trial court properly determined that the transcript was in fact not needed for an effective defense. The inquiry balances the value of the transcript to the defendant and the availability of alternative devices that would fulfill the same function as a transcript.

While there is language in *Britt* suggesting that the right to a transcript does not turn on whether the defendant specified at the trial level why the transcript was needed or whether the defendant had access to the court reporter's notes, we cited *Britt* in *Mosby* v. *State*, 253 Ark. 904, 489 S.W.2d 799 (1973), and stated that it was significant that appellant had failed to make *any* showing "that the transcript was needed to prepare his defense . . . [n]or was it shown that the reporter's notes . . . could not have been read back if and when they were needed." We find those same considerations determinative here.

■ The record reveals that at the time the initial requests were made for transcripts of the pretrial proceedings, the requests were based entirely upon conjecture and speculation that there "might" arise a need for the transcripts at trial. We would be hard pressed under those circumstances to say that the trial court erred in denying the requests at that juncture. Moreover, the record is devoid of any indication that later, when the alleged inconsistencies between pretrial and trial testimony were discovered, defense counsel made even the slightest effort to avail himself of the

common practice of asking the trial judge to have the court reporter read back the reporter's notes of those parts of the pretrial hearings relevant to the testimony at issue. As such, we cannot say that the trial court erred in denying Gardner's requests.

■ Our position on this issue finds further support in light of Gardner's failure to demonstrate that the trial court's action was prejudicial. *Sutherland, supra.* The focal point of Gardner's argument rests upon the contention that whereas one of the State's witnesses testified at the pretrial stage that she merely got a glimpse of Gardner's profile as he drove past her in Sara McCurdy's car, her trial testimony was that she was also able to see Gardner's face. We have carefully examined defense counsel's cross-examination efforts at trial as to this witness and find that counsel was able not only to effectively impeach the credibility of the witness by exposing the inconsistent testimony but actually managed to get the witness to admit she only glanced at the person in the car for a split second, mainly got a side view of the person, and didn't see enough of the face to even tell whether the person had facial hair or what his facial features were. That testimony parallels the pretrial testimony to an extent that any alleged inconsistencies, for all practical purposes, no longer existed — thereby rendering the need for the pretrial transcript of so little value that any error in denying Gardner's request would have been harmless at best. For the foregoing reasons we find Gardner's arguments on this issue without merit.

### III. THE DEATH PENALTY

■ Gardner argues that imposition of the death penalty constitutes cruel and unusual punishment. This point has no merit as it has been decided adversely to Gardner's position in prior cases. *Pickens* v. *State*, 292 Ark. 362, 730 S.W.2d 230, *cert. denied*, __ U.S. __, 108 S. Ct. 269 (1987).

### IV. ILLEGAL SEARCH

One of the items subject to seizure pursuant to the warrant used to search Gardner's room at the Downtowner Motor Inn was the purse Gardner was seen carrying near Pocola which was later identified as having belonged to Mrs. Joyce. In conducting the search on December 14 pursuant to the warrant, officers ex-

amined the purse but did not recognize it for what it was and failed to seize it prior to concluding the search. After receiving clarification as to the description of the purse, one officer returned to the Inn on December 16 and without a warrant requested and obtained custody of the purse and other items from employees of the Inn who had removed for storage all items remaining in Gardner's room after the initial search.

Gardner objected to introduction of the purse on the grounds that the evidence was illegally seized. The trial court admitted the evidence on the basis that it was "still covered" by the warrant and had been in plain view when the officer obtained custody. The court also found that after removal of the purse from Gardner's room by employees of the Inn, there no longer existed an expectation of privacy in the purse such as would warrant Fourth Amendment protection.

The Fourth Amendment's exclusionary rule protects against unlawful searches and seizures which violate the defendant's own constitutional rights, and those rights are violated only if the challenged conduct invaded the defendant's legitimate expectation of privacy. *Rakas* v. *Illinois*, 439 U.S. 128 (1978); *State* v. *Hamzy*, 288 Ark. 561, 709 S.W.2d 397 (1986). In view of the facts before us, we conclude that at the time custody of the purse was obtained by the officer, Gardner no longer could be said to have had an actual expectation of privacy which society would be prepared to recognize as reasonable. *Hamzy, supra.*

The record discloses that employees of the Downtowner Inn took possession of all items remaining in Gardner's room pursuant to the Inn's standard procedures. For code provisions governing liens on baggage and other property of potential or past motel guests, and the disposition thereof, see Ark. Code Ann. §§ 20-26-304 and 20-26-305 (1987). The items were then placed in storage by employees of the Inn, and there is absolutely no evidence that this action was done with the connivance of or at the behest of the police. *Cf. Walker* v. *State*, 244 Ark. 1150, 429 S.W.2d 121 (1968) (the search and seizure clauses are restraints upon the government and its agents, not upon private individuals).

While Gardner may have had certain rights as to the seizure of property from the motel room, we fail to see how it can

be said that at the time the officer obtained custody of the purse from employees of the Inn, Gardner still retained an expectation of privacy in the purse which would be recognized as reasonable by society and would warrant invocation of the Fourth Amendment's exclusionary rule. It is true that Gardner's inability to return to his room was not of his own chosing and that the officer could have obtained a second warrant authorizing seizure of the purse. These factors, however, do not affect our conclusion that Gardner could not reasonably claim an expectation of privacy in the purse after employees of the Inn had removed it from Gardner's former room and had taken it into their possession. Seizure of the bag by the officer was not unlawful, and the court did not err in failing to suppress the evidence.

Furthermore, we do not find that the trial court erred in failing to suppress the contents of the purse. While acting pursuant to a valid warrant, the officers responsible for the original search of Gardner's room opened the purse and *examined its contents*. Thereafter, the purse was secured by employees of the Inn. There is no indication that the purse was opened or its contents disturbed until the officers again obtained the purse from employees of the Inn and inventoried its contents. Under these limited circumstances, we conclude that whatever expectation of privacy Gardner might have had in the contents of the purse was not such that the subsequent examination of the contents of the purse would, under the Fourth Amendment, operate to exclude the evidence.

### V. MIRANDA WARNINGS

Gardner contends that the trial court erred by not suppressing statements made to the undercover officers who had offered Gardner a ride to Fort Smith. According to Gardner, the statements should have been suppressed because he was not advised of his *Miranda* rights prior to making the statements. The argument is meritless because it is premised upon the misconception that *Miranda* warnings are required whenever the State's investigation has "focused" on the defendant — notwithstanding a complete absence of the complusive aspect of custodial interrogation. That interpretation of the *Miranda* decision has been flatly rejected. *Beckwith* v. *United States*, 425 U.S. 341 (1976).

As noted by the Supreme Court in *Beckwith*, the

warnings required under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), come into play only when the defendant is subjected to custodial interrogation or the functional equivalent thereof in that he has been deprived of his freedom of action. In *Shelton* v. *State*, 287 Ark. 322, 699 S.W.2d 728 (1985), we cited language by the Supreme Court to the effect that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest. We stated that no *Miranda* warnings are required if the questioning by officers is simply investigatory and that an officer's unarticulated intent has no bearing on the question of whether a suspect is in custody; rather, on that issue, the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.

The record before us clearly discloses that Gardner was seeking a ride to Fort Smith, and the officers merely indicated that they were going in that direction and could give Gardner a ride if he would pay for the gas. Gardner agreed. One of the officers testified that he had orders not to pursue the matter should Gardner decline the offer. During the trip, Gardner left the vehicle on at least two occasions — once to purchase beer at a Road Runner stop-and-go and later to use the restroom. There is simply no evidence of a curtailment of freedom to a degree associated with formal arrest. Here, as in *Beckwith, supra*, appellant's argument would cut the Supreme Court's holding in *Miranda* "completely loose from its own explicitly stated rationale."

## VI. MOTION TO QUASH THE JURY PANEL

Gardner argues that he was denied his right to trial by jury in that the Arkansas system of selecting jurors at random from the current list of registered voters, Ark. Code Ann. § 16-32-103 (1987), does not result in a jury drawn from a fair cross-section of the community as a whole. Gardner also argues that this state's system of exempting certain professionals from jury service, Ark. Code Ann. § 16-31-103 (1987), constitutes a further prejudicial narrowing of the juror pool.

Gardner's proof at the trial level on either issue was so deficient that the motion to quash the panel could not reasonably have been sustained. For that reason, this court will not consider

striking down legislation when presented with arguments supported by such inadequate proof. *Sullivan* v. *State*, 287 Ark. 6, 696 S.W.2d 709 (1985). *See also Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984), *cert. denied*, 470 U.S. 1085 (1985).

## VII. PHOTOGRAPHS

On this point, Gardner contends that the court erred in not excluding various photographs depicting the bodies of the victims and the ransacked home. He contends that the prejudicial effect of the photographs outweighs their probative value, primarily because there is nothing depicted in the photographs which is connected to the appellant.

The admissibility of photographs is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Fitzhugh* v. *State*, 293 Ark. 315, 737 S.W.2d 638 (1987). We have often said that even inflammatory photographs may be admitted if they tend to shed light on any issue, if they are useful to enable a witness to better describe the objects portrayed, or if they better enable the jury to understand the testimony. *Fitzhugh, supra; Berry* v. *State*, 290 Ark. 223, 718 S.W.2d 447 (1986); *Perry* v. *State*, 255 Ark. 378, 500 S.W.2d 387 (1973).

We have examined the photographs at issue and find that whatever minimal prejudicial effect could be ascribed to them is clearly outweighed by their relevance and usefulness in enabling the jury to understand the testimony describing the scene and the circumstances surrounding the victims' deaths. The trial court committed no error in admitting the challenged photographs.

## VIII. MOTION TO DISMISS

Before trial, the defense filed a motion to conduct a hearing on whether there was probable cause to continue Gardner's pretrial detention without bail. At the conclusion of the hearing, Gardner moved to dismiss the second count of capital murder, namely, that in the course of committing a rape or attempting to commit a rape, Gardner had caused the death of Sara McCurdy. The basis for Gardner's motion was that the State had failed to prove that Gardner had raped Sara McCurdy. Because the trial court found probable cause to detain Gardner in connection with

the deaths of all three victims, the motion was denied.

Rule 8.4(c) of the Arkansas Rules of Criminal Procedure provides that in making his determination on the issue of the defendant's pretrial release, the presiding judicial officer shall "determine by an informal, non-adversary hearing whether there is probable cause for detaining the arrested person pending further proceedings. The standard for determining probable cause at such hearing shall be the same as that which governs arrests with or without a warrant."

The issue, therefore, is whether there is probable cause to continue detaining the suspect, not whether the State will be able to prove every element of its case on each of the charges. Probable cause is said to be "only a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that a crime has been committed by the person suspected." *Hines* v. *State*, 289 Ark. 50, 709 S.W.2d 65 (1986). By the conclusion of the preliminary hearing, the State had clearly presented sufficient evidence to demonstrate probable cause to continue holding Gardner for the murders of Mr. and Mrs. Joyce and Sara McCurdy. That being the case, the primary function of the hearing — whether Gardner should remain in custody — had been accomplished. Its purpose in protecting both the State's interests and the appellant's rights had been fulfilled. *See State* v. *Garrison*, 272 Ark. 470, 615 S.W.2d 371 (1981). Hence, no prejudice could result from any alleged failure on the part of the State to present sufficient proof as to the rape charge at this juncture in the proceedings.

### IX. FAILURE TO EXCUSE JURORS FOR CAUSE

On this point, Gardner contends that the trial court erred in failing to excuse for cause six potential jurors — three of whom were eventually seated — and that the court's failure to do so denied Gardner a fair trial. We disagree.

To succeed on this point, Gardner must show that one of the jurors actually seated should have been excused for cause. In order to make that showing, Gardner must demonstrate that after exhausting all of his peremptory challenges, he was forced to accept a juror against his wishes. *Watson* v. *State*, 289 Ark. 138,

709 S.W.2d 817 (1986); *Burnett* v. *State*, 287 Ark. 158, 697 S.W.2d 95 (1985), *overruled on other grounds, Midgett v. State*, 292 Ark. 278, 729 S.W.2d 410 (1987). Therefore, we do not consider Gardner's arguments as concerns jurors either accepted by him while he had peremptory challenges remaining or those not accepted by appellant but excused by peremptory challenge. Two jurors were seated, however, after Gardner had exhausted his peremptory challenges. Both had been challenged for cause by Gardner.

On this particular issue, it is not necessary that jurors be totally ignorant of the facts surrounding the case, as long as they can set aside any impression they have formed and render a verdict solely on the evidence at trial. *Swindler, supra.* Also, jurors are presumed unbiased and the burden of proving actual bias is on the party challenging the juror. *Fleming* v. *State*, 284 Ark. 307, 681 S.W.2d 390 (1984). We will look closely, however, at whether a particular juror who has been challenged was actually unbiased notwithstanding the State's success in rehabilitating the juror. *Pickens, supra; Ruiz & Van Denton, supra.* The trial court's decision will not be reversed absent an abuse of discretion. *Fleming, supra.*

As to one of the two jurors at issue, James Curtis, the appellant argues that the juror was predisposed to finding appellant guilty and that he was in favor of imposing the death penalty. Contrary to appellant's latter contention, Curtis, when asked by defense counsel what his feelings were about the death penalty, stated:

> Well, I believe if the evidence indicated guilt I could vote for the death penalty. I may be less comfortable with that than I would be the other penalty [life without parole] simply because it, you know, it means there's absolute certainty. There's no coming back.

With respect to the assertion that Curtis was predisposed to finding Gardner guilty, defense counsel had on two separate occasions inquired whether Curtis felt that it was more probable than not that Gardner was guilty by virtue of the fact that Gardner was the one arrested for the crimes. Each time, Curtis responded that Gardner's arrest only left him with the impression that there must have been some basis for the arrest. He added,

however, that he would listen to the evidence and decide the case on that basis alone.

As to the other juror, Mrs. Dean Bland, appellant contends that the juror was predisposed in favor of imposing the death penalty. At one point, defense counsel inquired what the juror's feelings were about the death penalty. She responded that she believed in the death penalty but thought there were times it should be tempered with mercy and that there were situations where the death penalty would not be appropriate even if the defendant were guilty. She also added that she was not leaning towards either penalty in the present case. Defense counsel then inquired whether she would lean towards the death penalty if Gardner was found guilty. Mrs. Bland stated that if Gardner were proven guilty beyond a reasonable doubt, and depending upon the evidence relevant to his motive or mental state, she would lean towards the death penalty. She also stated on direct examination during voir dire that she could vote for either penalty, but it would be a difficult thing to vote for the death penalty, and she could not say which way she would vote before hearing the evidence.

We have carefully examined the record as to both jurors. There is nothing to indicate that they could not follow the instructions of the court or set aside whatever impressions they might have and give Gardner a fair and impartial trial. Certainly, there was no abuse of discretion by the trial judge on this issue.

## X. ADDITIONAL PEREMPTORY CHALLENGES:
## XI. EXCLUSION OF EVIDENCE

For his tenth point, Gardner argues "that Arkansas Law allows additional peremptory challenges at the discretion of the Trial Court," and that it was an abuse of discretion to deny Gardner's request for five additional peremptory challenges after he had exhausted the twelve allowed by Ark. Code Ann. § 16-33-305 (1987). For his eleventh point, Gardner contends that certain items of evidence, such as photographs of the material used to gag the victims, were inadmissible because they could not be connected or traced to Gardner.

However, Gardner has failed to cite any authority for either broad proposition and has failed entirely to provide

convincing argument on these points. If, without further re-search, it appeared at all that the arguments were well taken, we could ignore the failure to cite authority. Under the circumstances, because the arguments are so obviously lacking in merit and are unsupported by any citation of authority, we decline to research the issues on appellant's behalf and will not consider either point. *Ricarte* v. *State*, 290 Ark. 100, 717 S.W.2d 488 (1986); *Dixon* v. *State*, 260 Ark. 857, 545 S.W.2d 606 (1977).

On Gardner's eleventh point, we should further note that the proposition put forth, which in some instances would limit the proof to direct evidence only, ignores the rationale behind Rules 401 and 402 of the Arkansas Rules of Evidence.

## XII. TATTOOS

At trial, one of the State's witnesses who had seen Gardner near Pocola, Oklahoma, described certain tattoos on Gardner's forearms. The prosecutor then asked that the witness be allowed to view Gardner's forearms in the court room. Defense counsel indicated that this should have occurred prior to trial, and the prosecutor withdrew his request. Gardner moved for a mistrial, which was denied. On appeal, Gardner contends that the trial court erred in denying his motion for a mistrial and asserts that where identification is an issue, forcing Gardner to display his forearms would violate his Fifth Amendment right not to incriminate himself. From that, Gardner suggests that the prosecutor made his request knowing that he would withdraw it and that this was done only to make Gardner appear guilty in the eyes of the jurors by virtue of defense counsel's in-court objection to having Gardner display his arms. We find no merit to the argument.

The protections of the Fifth Amendment do not extend to demonstrative, physical tests, but are intended to immunize the defendant from providing the State with evidence of a testimonial or communicative nature. *Weatherford* v. *State*, 286 Ark. 376, 692 S.W.2d 605 (1985). The prosecution's request that Gardner display his arms was perfectly proper — as would have been an order by the court that Gardner comply with the request. *Urquhart* v. *State*, 273 Ark. 486, 621 S.W.2d 218 (1981). Gardner's second assertion is based entirely upon unfounded speculation, unsupported either by citation of authority or convincing argument. We find no evidence that the prosecutor

made his request in anything other than good faith, and while the request was withdrawn notwithstanding that it was within the court's discretion to grant it, we find no indication in the record that any prejudice resulted therefrom. Certainly not to an extent warranting a mistrial, which we have stated is a drastic remedy that is only appropriate if justice cannot be served by continuation of the trial and when it is obvious that the prejudice could not be removed by any other means. *Birchett* v. *State*, 294 Ark. 176, 741 S.W.2d 267 (1987).

## XIII. PECUNIARY GAIN

Gardner argues the prohibition against "double-counting" as set out in *Collins* v. *Lockhart*, 754 F.2d 258 (8th Cir.), *cert. denied*, 474 U.S. 1013 (1985), was violated by the manner in which the prosecutor argued pecuniary gain as an aggravating circumstance before the jury, and because pecuniary gain was in fact submitted to the jury as an aggravating circumstance. We find the argument to be totally without merit.

First, Count I charged that Gardner had caused the deaths of at least two persons during the same criminal episode. Count II charged that Gardner had committed or attempted to commit rape and in the course thereof or in furtherance thereof had caused the death of Sara McCurdy. *See* Ark. Code Ann. § 5-10-101 (1987). On both counts, the jury found that the aggravating circumstance was that Gardner had on a prior occasion (the incident in Illinois) committed a felony an element of which was the use or threat of violence to another, creating a substantial risk of death or serious physical injury. *See* Ark. Code Ann. § 5-4-604 (1987).

Second, as this court noted in *O'Rourke* v. *State*, 295 Ark. 57, 746 S.W.2d 52 (1988), the double-counting issue in capital murder cases was resolved by the Supreme Court's recent decision in *Lowenfield* v. *Phelps*, ___ U.S. ___, 108 S. Ct. 546 (1988). The Supreme Court in *Lowenfield* stated that, to pass constitutional muster, a capital-sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder. In *O'Rourke*, we found that in Arkansas the mandated narrowing function was performed at the guilt phase, and we quoted

language from *Lowenfield* that, therefore, " 'the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.' "

## XIV. CHAIN OF CUSTODY

Gardner challenges the court's failure to prevent introduction of evidence (jewelry) for lack of a proper chain of custody. The jewelry was obtained from inside a tan bag which Arkansas State Police officers in Little Rock had confiscated from Gardner's motel room and had inventoried but in which they had failed to find jewelry. The jewelry was not found until officers from Fort Smith, who obtained custody of the bag from the Little Rock officers, again inventoried the contents of the bag and found the evidence in a zippered side compartment.

The purpose of the rule requiring a chain of custody is to prevent the introduction of evidence which is not authentic. If the trial court is satisfied that in reasonable probability the evidence has not been tampered with, it is not fatal that the State did not eliminate every possibility of tampering. *Gardner v. State*, 263 Ark. 739, 569 S.W.2d 74 (1978), *cert. denied*, 440 U.S. 911 (1979). In such matters, the trial court is accorded some degree of discretion and in the absence of evidence indicating tampering, we will not reverse the trial judge's ruling unless we find an abuse of discretion. *White* v. *State*, 290 Ark. 130, 717 S.W.2d 784 (1986). Here, a clear chain of custody had been established as to the tan bag itself, and there was absolutely no evidence of tampering with the bag or its contents. Minor uncertainties in the proof of chain of custody are matters to be argued by counsel and weighed by the jury, but they do not render evidence inadmissible as a matter of law. *Gardner, supra.*

Moreover, when an object is subject to positive identification, such as the jewelry at issue here, as opposed to blood samples or drugs, the proof of chain of custody need not be as conclusive as it should be with respect to interchangeable items. *White, supra.* In any event, introduction of the jewelry would have been harmless error at best given the numerous other items found either in Gardner's room, on his person, or which had been pawned by Gardner and had originally been taken from the Joyce residence. As such, we find no abuse of discretion by the trial court in admitting the evidence.

## XV. OFFICER'S TESTIMONY

Gardner contends that the trial court erred in denying his motion for a mistrial when, on examination of one of the police officers, testimony was elicited that the officers investigating the murders stopped looking for other suspects after they found out that "Mark Gardner, who was wanted at the time, had pawned articles in Little Rock." Appellant suggests that the term "wanted" as used by the officer was a reference to the charges pending against Gardner in Illinois, which evidence should not have come before the jury.

We find no merit to Gardner's argument because he is unable to show how he was prejudiced. First, the officer testified in chambers that what he meant was that Gardner was wanted locally in connection with the murders and that the search for other suspects ended when it was learned that Gardner had pawned "jewelry" in Little Rock. Also, the officer stated he did not even know of the Illinois charges until after Gardner's arrest. Second, defense counsel refused the court's offer of an admonition to the jury because he did not want to draw attention to the officer's statement, and he failed to ask that the statement be stricken from the record. *See Birchett, supra.* Under these circumstances, we find no error in the trial court's refusal to grant Gardner's motion for a mistrial.

## XVI. DIRECTED VERDICT

On this point, Gardner "requests that the Court review the entire record to determine whether sufficient evidence exists to support a conviction of two counts of capital murder. In particular, Count II . . . [as there] is absolutely no evidence that Appellant raped Sara McCurdy." Gardner contends that the trial court erred in failing to direct a verdict in his favor on both counts.

Motions for a directed verdict constitute challenges to the sufficiency of the evidence, and on appellate review we seek to determine whether the verdict is supported by substantial evidence. *Nichols* v. *State*, 280 Ark. 173, 655 S.W.2d 450 (1983). Substantial evidence, whether direct or circumstantial, must be of sufficient force and character that it will, with reasonable and material certainty and precision, compel a conclusion one way or

the other. It must force or induce the mind to pass beyond suspicion or conjecture, and a verdict should only have been directed below where there was no evidence from which the jury could have found the defendant guilty without resorting to surmise and conjecture. *Id*.

In determining the sufficiency of the evidence, it is necessary to ascertain only the evidence favorable to the appellee State, and it is permissible to consider only that testimony which supports the verdict of guilt. *Brown* v. *State*, 278 Ark. 604, 648 S.W.2d 67 (1983). Even circumstantial evidence may be sufficient to sustain a conviction, *Still* v. *State*, 294 Ark. 117, 740 S.W.2d 926 (1987), as it may constitute substantial evidence. Whether the circumstantial evidence excludes every other reasonable hypothesis is for the fact finder to determine. *Boone* v. *State*, 282 Ark. 274, 668 S.W.2d 17 (1984).

We have diligently examined the record, as we must, and fail to see how appellant can seriously contend that there is insufficient evidence to support the verdicts of guilt on either count of capital murder. The facts which support the verdict have been set out and we do not repeat them here. On the underlying felony of rape, we add only that the State introduced the testimony of a forensic serologist who stated that his examination of Sara McCurdy established the presence of semen. One of the officers testifying on behalf of the State added that Sara McCurdy was found with her jeans pulled on, but that she had no undergarments on. There was additional testimony by Cindy Griggs that Sara McCurdy was having her menstrual period, and the officer testified that a wet tampon was found by the bed in a bedroom other than the one where Sara McCurdy was found. These facts must be viewed in light of testimony that Sara McCurdy was on a lunch break from work; all of which supports the charge that the murder of Sara McCurdy took place during the commission of a rape or in furtherance thereof. We find no error in the trial court's failure to direct a verdict in appellant's favor.

## XVII. NEWSPAPER ARTICLE

Gardner contends that the court erred in not having sequestered the jury and in failing to grant his motion for a mistrial when on the final day of trial it was brought to the court's

attention that on the preceding evening a newspaper article had been published containing material prejudicial to appellant. Gardner concedes that the trial court had instructed the jurors not to read anything about the case and that when the court inquired of the jury whether anyone had read the article in question, it was determined that none of the jurors had even seen it. On this point, Gardner does no more than complain about the potential of prejudice — something for which we do not reverse. *Berna, supra. See also Wright v. State,* 267 Ark. 264, 590 S.W.2d 15 (1979).

## XVIII. TRIAL COURT ERRED IN PERMITTING EXAMINATION OF WITNESSES FROM ILLINOIS AS TO ALLEGED CRIMES COMMITTED BY APPELLANT IN THAT STATE

At the sentencing phase of Gardner's trial, the court allowed the prosecution to bring in a couple from Illinois who testified in detail as to crimes committed against them by appellant in that state. The crimes involved breaking and entering, rape, and theft. The State's purpose in introducing the testimony was to present evidence of a prior violent felony committed by Gardner. Ark. Code Ann. § 5-4-604(3) (1987). The couple's testimony was corroborated to some extent by officers from Illinois who in turn linked appellant beyond a reasonable doubt to the crimes committed in that state by matching a footprint found in the home in Illinois to a tennis shoe found in Gardner's room at the motel in Little Rock. Additional evidence linking appellant to the Illinois crime was also introduced.

Appellant's challenge to the proceeding is that the State should only be allowed to show prior "convictions" not just prior felonies committed beyond a reasonable doubt, which can then be used by the jury in making its determination as to the type of punishment to be imposed. The exact argument has been rejected by this court in its interpretation of our statutes. *See Miller v. State,* 280 Ark. 551, 660 S.W.2d 163 (1983). Gardner asks that we overrule our decision in *Miller,* but we have not been presented with any compelling reason to do so. Appellant's point is without merit.

## *XIX. WITNESS IDENTIFICATION:*
## *XX. JURY INSTRUCTION ON SEXUAL ACTIVITY*

For his nineteenth point, Gardner reargues point number eighteen and adds that it was error to allow one of the witnesses from Illinois to testify as to having been raped during the episode in Illinois as she could not positively identify Gardner as the rapist. For his next point, Gardner argues that it was error to instruct the jury relative to the rape charge as there was insufficient evidence that Gardner had raped Sara McCurdy — an argument dealt with to some degree in point number sixteen.

In neither instance has Gardner provided us with convincing argument or with such citation of authority as would indicate that the points raised had any merit or were otherwise well taken. For that reason, and in light of our discussion on points sixteen and eighteen, respectively, we see no reason to address the arguments under this heading in any greater detail. *Ricarte, supra; Dixon, supra.*

## *XXI. NEW TRIAL*

For his final point, Gardner argues that based upon the cumulative effect of all errors allegedly committed, it was error not to grant a new trial. The decision whether to grant a new trial is left to the sound discretion of the trial judge and will not be reversed in the absence of an abuse of discretion or manifest prejudice to the complaining party. *Foster* v. *State*, 294 Ark. 146, 741 S.W.2d 251 (1987). In light of our disposition of the issues and points discussed above, and because we find neither an abuse of discretion nor manifest prejudice, the trial court's denial of the motion for a new trial was proper.

Affirmed.