Teddy Wayne GRAHAM *v.* STATE of Arkansas

CR 88-54                                        757 S.W.2d 538

Supreme Court of Arkansas
Opinion delivered October 3, 1988
[Rehearing denied October 31, 1988.*]

---

*Purtle, J., would grant rehearing.

*James R. Marschewski*, for appellant.

*Steve Clark*, Att'y Gen., by: *William F. Knight*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. The appellant, Teddy Wayne Graham, was convicted of aggravated robbery and of being a felon in possession of a firearm. He contends the trial court erred in permitting the victim of the crime to identify him at the trial, given her identification of another person as the culprit in a pre-trial photo lineup in which Graham's picture appeared, and of yet another person in a pre-trial stand up lineup. He also contends a mistrial should have been granted when a witness who had been excluded from the courtroom during the testimony of other witnesses repeatedly looked into the courtroom and then gave unanticipated testimony that he recognized Graham as the driver of a car leaving the victim's residence near the time the crime occurred. His final contention is that he was improperly denied a transcript of pre-trial proceedings for use at the trial. We find no merit in these contentions and affirm.

Linda Sosebee entered her home around 2:00 p.m. on June 30, 1986, and was confronted by a person pointing a gun at her and holding a cloth over the lower portion of his face. The house

had been ransacked. The gunman told her to move to the rear of the house. She ultimately went into a bathroom and locked the door. Apparently the gunman left the premises, and Sosebee called the police who arrived sometime shortly thereafter. There was conflicting police testimony about the lighting conditions in the house. One officer said he had to use a flashlight to see in the hallway where the confrontation had occurred. Another said he could see well enough without turning on lights.

Just after the event, Ms. Sosebee told officers she was unsure whether she could identify her assailant. She gave a physical description of him which matches the description of Graham. On July 8, 1986, an officer came to her home and showed Ms. Sosebee a photo lineup which included a picture of Graham taken three years earlier with his eyes closed. She was unable to make a positive identification, but she selected the photograph of a person other than Graham as the one most resembling the robber.

On August 5, 1986, Ms. Sosebee was presented with a live or "stand up" lineup at police headquarters. Graham was not in the lineup. An officer conducting the lineup testified he told Sosebee not to make any identification unless she was positive. On the form given to her for identification she marked the lineup number of one of the participants. At the trial, she testified she did not intend a definite identification, but rather to choose a person most resembling the robber. She said she made her choice because the person selected had tatoos. This testimony was corroborated by an officer who was present. He said Ms. Sosebee told him she made her selection because she remembered tatoos on her assailant, and she did not intend a positive identification of anyone in the lineup.

On August 14, 1986, Officer Thomas made a photograph of Graham which he later presented to Ms. Sosebee along with others. He had covered the lower portions of the faces to simulate the appearance of the assailant as Ms. Sosebee saw him. She positively identified Graham as the robber. At trial, she again positively identified Graham as the person she had confronted in her home.

## 1. Identification reliability

In support of his contention that Ms. Sosebee's identification of him should have been suppressed, Graham cites *Synoground* v. *State*, 260 Ark. 756, 543 S.W.2d 935 (1976). There, however, the witness identified a photograph of the appellant in a photo lineup, but at a suppression hearing he was unable to identify the appellant. All the photographs shown to the witness were in black and white except the one of the appellant which was in color. Each photograph showed a date, the one of the appellant being the most recent. In addition, the witness insisted the person he had seen running from the scene of an attempted burglary had blond hair. He made his identification of the person in the photograph on the basis of blond hair. The appellant, as he appeared at the hearing, had brown hair. At the trial some three days later, the witness said the person he saw at the crime scene had hair that was "blondish brown, brown, dark." 260 Ark. at 760, 543 S.W.2d at 936.

Our opinion recognized that only when procedures leading to an identification are so defective as to undermine reliability should the question whether an in-court identification will be permitted become one of law to be taken from the jury. We found the witness's testimony to be that unreliable not only because of the factors making the photograph of the appellant unique among those from which the witness selected, but because of his complete reliance on hair color (which seemed to vary) and his total inability to identify the appellant face to face. Obviously, the case is not like the one before us now.

Here there is no allegation of police misconduct. The only allegation of suggestiveness in the photo lineup from which Graham's picture was identified is that its background is some-what lighter than those in the other pictures. The only contention which gives us some concern is Ms. Sosebee's selection of other persons in the first two lineups prior to her selection of Graham in the third lineup and her positive identification of him at the trial.

To determine whether a proposed in-court identification should be suppressed as unreliable, the Supreme Court has used the following criteria:

> the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between the pre-lineup

description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and lapse of time between the alleged act and the lineup identification. [*United States* v. *Wade*, 388 U.S. 218, 241 (1967)].

■ We consider the same factors. *Cook* v. *State*, 283 Ark. 246, 675 S.W.2d 366 (1984); *Fountain* v. *State*, 273 Ark. 457, 620 S.W.2d 936 (1981). The question is one of mixed law and fact, and thus we do not reverse the trial court's decision unless we find it to have been clearly erroneous. *Cook* v. *State, supra; Glover* v. *State*, 276 Ark. 253, 633 S.W.2d 706 (1982).

■ We cannot say the trial court's decision was clearly erroneous. The tenuous nature of the misidentifications in the first two lineups reduces their significance. The lapse of time between Ms. Sosebee's confrontation with the robber and her identification of Graham was short. While some doubt was induced about her ability to see him and the duration of her opportunity to observe him, she testified that the thirty seconds or so she stood in his presence in her home seemed like a long time, and her identification at the trial was definite and unshaken by cross-examination.

## 2. The other witness

Jerry Schaffer was called by the prosecution. His anticipated testimony was that he had seen a particular type of car, similar to a car owned by Graham, leave the Sosebee residence on the day of the robbery. The witnesses were excluded from the courtroom pursuant to A.R.E. 615. During a recess the prosecutor was informed that Schaffer could identify Graham as the person he had seen driving the car. When Schaffer took the witness stand, he testified he had seen the man driving the car and he was in the courtroom. Graham's counsel objected and moved for a mistrial. The judge held a voir dire of the witness at which it was determined that, while waiting to testify, Schaffer had peeped into the courtroom some 20 or 25 times, and it had come to him that Graham was the driver despite Schaffer's earlier statement that he would be unable to identify the driver but could identify the car if he were to see it again.

■ By allowing voir dire of Schaffer, the trial court permitted Graham's counsel to expose thoroughly to the jury the means by which Schaffer had come to his identification testimony. It was not improper to deny the motion for a mistrial. Despite the possible violation, in spirit at least, of Rule 615 the court was correct to permit the testimony. Even if there has been a clear violation of the rule, the trial court has the option of permitting comment on the witness's violation of the rule in order to reflect on his credibility. *Blaylock* v. *Strecker*, 291 Ark. 340, 724 S.W.2d 470 (1987). That was the effect of permitting voir dire of the witness, and we find no error.

### 3. *The pre-trial hearing transcript*

Graham filed a motion to have a transcript of the suppression hearing made available to him before his trial. The motion stated only that he planned to introduce the transcript as evidence, and that he needed to review the transcript or otherwise be hampered in his defense by his inability to remember what the witnesses had said at the hearing. Graham's counsel argued the motion by saying that "some of the witnesses may not say the same thing at the trial that they said at the hearing," and the transcript was needed for impeachment purposes. He mentioned the police officers who had testified and Ms. Sosebee who, he said, "may say something different than was said in the hearing."

■ We agree that a defendant may be entitled to such a transcript if he can demonstrate it is needed for an effective defense. *Britt* v. *North Carolina*, 404 U.S. 226 (1971). However, we have clearly held that a general allegation that it might be used for impeachment purposes is an insufficient basis for requiring that such a motion be granted. *Gardner* v. *State*, 296 Ark. 41, 754 S.W.2d 518 (1988).

### *Conclusion*

■ This has not been an easy case to decide. But for Ms. Sosebee's corroborated testimony that her intentions were not to make positive identifications in the first two lineups, it might have gone the other way. Nor do we take lightly the problem with Schaffer's testimony. The dissenting opinion narrates the facts as a good defendant's advocate might relate them to a jury; it states them most favorably to the appellant. Our obligation, however, is

to view the evidence most favorably to the position of the appellee. *Marx* v. *State*, 291 Ark. 325, 724 S.W.2d 456 (1987); *Dix* v. *State*, 290 Ark. 28, 715 S.W.2d 879 (1986); *Lane* v. *State*, 288 Ark. 175, 702 S.W.2d 806 (1986); *Westbrook* v. *State*, 286 Ark. 192, 691 S.W.2d 123 (1985); *Mason* v. *State*, 285 Ark. 479, 688 S.W.2d 299 (1985).

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. Additional facts should be stated in order to have a comprehensive understanding of this case. There is no doubt whatsoever Ms. Sosebee's home was burglarized by someone and that she was terrorized by that same individual. However, the individual who committed these acts is the one who should be punished, not someone who happens to look a lot like him.

One officer who investigated this crime stated that the hallway, where Ms. Sosebee encountered the intruder, was so dark at midafternoon that he had to use his flashlight to get around. Admittedly the victim did not get a good look at her assailant; shortly after the crime she told officers that she probably couldn't identify him because he had a cloth over the lower part of his face. She did say that he was a white male in his mid-twenties, about five feet eight inches tall with brown hair, and wearing faded bluejeans and a light colored shirt. (This description no doubt fits many persons.) Understandably, the victim was looking at the gun, not her assailant's face, as she went down the hallway. Although he was holding a cloth or handkerchief over the lower part of his face with his left hand, she did not see the name "Ted" tatooed across his fingers.

The first photographic lineup was held eight days after the crime. The victim identified the number six photograph as the robber. This photograph was of one Scott Middleton. The appellant's photograph was number three in that same lineup. However, the victim did not identify the appellant as her assailant.

Sometime later a standup lineup was conducted and the victim indicated an individual in the number two spot looked the most like her assailant. The individual she identified was one

Kenneth Newell. In fact the appellant was not even in that lineup. At that time the police suspected Terry Nichols was the thief in this case. It was Nichols' car which had been seen in the neighborhood, and several of the items stolen from the house were found in his car.

When the third attempt at identification came around on August 15, 1987, the victim picked out the appellant. By this time she had learned that Ted Graham was the one the police suspected of the crime. Meantime, it had been determined that the appellant had a tatoo not only across his left hand but on his right arm. At this lineup, the appellant was not wearing a shirt and his hair was longer than any of the others.

By the time the victim got to trial and saw the appellant seated at counsel's table, there was no way on earth she could keep from identifying him, no matter how hard she tried to be unbiased by her previous misidentification of the appellant. By this time this man had become fixed in her mind as the person who had committed the crime. From the evidence presented I believe that she would have identified Nichols as her assailant if he had been the accused.

The second prejudicial error was allowing witness Schaffer to identify the appellant as the person he had seen in that neighborhood the day of the crime. Schaffer had reported a suspicious-looking car about a block from the home of the victim on the afternoon the crime was committed. He had described a person fitting the general description of Nichols and had told the police that the man driving the car had a beard. On this same date the victim had told the police that the person who committed the crime did not have a beard. By the time of trial, the appellant had grown a beard. Schaffer was excluded from the room during the trial but admittedly "peeped" into the courtroom some twenty to twenty-five times. He saw a person seated at the table with defense counsel and no doubt had no trouble convincing himself that the accused was indeed the man he had seen in the neighborhood the day of the crime. The fact that the accused was of the same general build as the person he had seen, and by the time of trial had a beard, made it all the easier for this witness to convince himself of the correctness of his identification. Aside from the fact that this witness mistakenly identified the accused

as the man he had seen on the afternoon of the crime, Schaffer, like the other witnesses at the trial, was under "the rule," and clearly violated the instruction of the court by "peeping" into the courtroom before he was called.

Whether we continue to review identification cases utilizing the standard "totality of the circumstances" or "clearly erroneous" or both, as we sometimes do, this case should be remanded for a new trial.

In *Frensly* v. *State*, 291 Ark. 268, 724 S.W.2d 165 (1987), we stated: "Finally, the totality of the circumstances shows that the lineup was not unduly suggestive." After discussing the discrepancies and weaknesses of the identification procedure in the trial court, we further stated: "These credibility factors, when considered in the totality of the circumstances, are not sufficient to make the trial court's ruling clearly erroneous."

Apparently the majority holds that appellate courts do not consider the totality of the circumstances when deciding this issue on appeal. If so, we should make it clear that we do not. It seems to me to be a ready made excuse for appellate courts to avoid ruling on the hard facts and law of a particular case. If prejudicial error has occurred we ought to remand a case for a fair trial. If not, we ought to say why and not evade the issue by stating that the "totality of the circumstances" require us to affirm or reverse the case. The phrase, it seems to me, sometimes is the reason given for stopping short of giving full effect to the law as it is written.

It is true, as the majority states, that I have stated the case in the terms of a defense lawyer. However, the majority has admittedly stated the facts from the view of a prosecutor. We should do neither. We should review the case from a perspective which will further the administration of justice and insure the statutory and constitutional rights of both the state and the accused. There should be a balancing process, giving due regard to the rights of all parties.