**Mark Edward GARDNER, Petitioner,**

v.

**Larry NORRIS, Director, Arkansas Department of Correction, Respondent.**

**No. PB–C–89–99.**

United States District Court, E.D. Arkansas, Pine Bluff Division.

Dec. 12, 1996.

· Mark S. Cambiano, Cambiano Law Firm, Morrilton, AR, Deborah Ruth Sallings, Roland, AR, for Plaintiff.

Clint E. Miller, Arkansas Attorney General's Office, Joseph V. Svoboda, Kelly K. Hill, Pamela Rumpz, Little Rock, AR, for Defendant.

### *MEMORANDUM OPINION*

H. FRANKLIN WATERS, Chief Judge.

## I. Introduction

On June 7, 1986, petitioner was convicted of two counts of capital murder and sentenced to death by lethal injection. Petitioner appealed his sentence to the Arkansas Supreme Court raising twenty-one points of error. In an opinion on June 20, 1988, the Arkansas Supreme Court affirmed petitioner's conviction. An execution date for the petitioner was set for October 17, 1988.

In September of 1988, petitioner filed a pro se petition for writ of habeas corpus in the Eastern District before the Honorable Judge George Howard, Jr. At that time, Judge Howard granted a stay of execution and appointed petitioner's present counsel.

Following respondent's motion to dismiss the claim for failure to exhaust state remedies, the court dismissed the action without prejudice in order for the petitioner to exhaust his state remedies. Subsequently, petitioner filed a Rule 37 petition with the

Arkansas Supreme Court which was denied on February 3, 1989. ARK.R.CRIM.P. 37.

On February 16, 1989, petitioner filed a petition for writ of habeas corpus which was assigned to Judge Howard, and petitioner later amended the petition on September 1, 1989. On April 13, 1989, respondent filed a motion to dismiss petitioner's habeas claim. Although a number of evidentiary hearings were held, no other actions were taken until, by an order on October 2, 1996, Judge Howard transferred the case to this court.

On November 13, 1996, this court denied petitioner's objection to the transfer of the case to this court and took under advisement petitioner's request to reopen hearings on this matter until such time as it could familiarize itself with the record as required by Rule 63 of the Federal Rules of Civil Procedure. Rule 63 outlines the requirements in a situation where one judge replaces another when the matter is already underway. In order to proceed, it is required that this court certify familiarity with the record and determine if the proceedings may be completed without prejudice to the parties. FED. R.CIV.P. 63. After careful review of the record of both the prior state and federal court proceedings, this court is prepared to certify its familiarity with the record and that these proceedings may be completed without prejudice to the parties. A separate order certifying such will entered concurrently with the filing of this opinion.

As noted above, the court has, until this point, taken under advisement petitioner's request to reopen hearings on this matter. Petitioner has had three separate hearings on this matter over a span of more than three years almost entirely about his claim of ineffective assistance of counsel. Petitioner rested his case in chief prior to the case being transferred to this court.

After full consideration of petitioner's claims and the testimony given at the prior hearings, the court will deny petitioner's request to reopen hearings. Due to the nature of the claims presented, as outlined below, the court believes that the vast majority of that which petitioner presented at the earlier hearings is immaterial to the court's determination of his claims. Further, that portion of the prior hearings which the court may rely on does not require any credibility determinations be made by this court. Accordingly, petitioner's request to reopen the proceedings will be denied.

After certifying familiarity with the record and determining that the proceedings in this case can be completed without prejudice to the parties and without further hearings, this court is prepared to rule on the merits of petitioner's habeas claim. For the reasons outlined below, this court determines that petitioner's habeas claim should be, and hereby is, dismissed with prejudice.[1]

## II. Facts

The facts of this case are laid out with sufficiency in the record below, *Gardner v. State*, 296 Ark. 41, 754 S.W.2d 518 (1988), so for the sake of brevity the court will only outline the relevant facts. Further facts will be provided in the text of this opinion when appropriate.

In the afternoon of December 12, 1985, the bodies of Joe and Martha Joyce and their daughter Sara McCurdy were discovered in

---

1. This court is cognizant of the fact that on April 24, 1996, President Clinton signed into law the Anti–Terrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (codified at 28 U.S.C. §§ 2241–2255, 2261–2266), which significantly changes habeas corpus procedures under 28 U.S.C. § 2254 and related statutes. Potentially significant to cases such as this one, the Act streamlines habeas procedures and limits the federal courts' ability to grant petitions, hold evidentiary hearings, and review certain claims. The Act also prioritizes habeas petitions above all matters on federal court dockets, and sets rigid time limits for filing and ruling on petitions. The Eighth Circuit Court of Appeals has declined so far to determine whether the revised § 2254 is applicable to habeas appeals already pending prior to its enactment. *Bannister v. Delo*, 100 F.3d 610, 612 n. 2 (8th Cir.1996); *Preston v. Delo*, 100 F.3d 596, 600 n. 4 (8th Cir.1996). In both *Bannister* and *Preston, supra*, the Eighth Circuit found that a petitioner's claims failed to survive the more lenient standards of the pre-Act § 2254, and so it was unnecessary to analyze the claims under the newer, more stringent Act.

The same is true here. This petition could be denied under the old 28 U.S.C. § 2254, so the court will not attempt to measure the petition against the revised statute.

the Joyces' residence in Fort Smith, Arkansas. Mr. Joyce was found in one room tied to a chair with his own neckties, bound and gagged, with a necktie tied so tightly around his neck that it had to be cut free. Mrs. Joyce was found bound and gagged in one of the bedrooms. Sara McCurdy was found in another bedroom also bound and gagged. Sara had a belt wrapped around her neck and a metal coat hanger twisted tightly around her neck. The medical examiner determined that the cause of death for all three of the victims was strangulation. At trial, the state also produced evidence which will be discussed below that Sara McCurdy had been raped.

The testimony at trial revealed that several items were missing from the Joyces' home. These items included a bag of silver coins, money, knives, a purse, binoculars, and numerous pieces of jewelry. One of the witnesses at trial, Cindy Griggs, the Joyces' other daughter and McCurdy's sister and co-worker, testified with particularity to the description of the knives, purse, binoculars, and jewelry.

Testimony and evidence introduced at trial developed the following. On December 12, at approximately 3:30 a.m., petitioner checked into the Regal 8 Inn in Fort Smith. Shortly before 11:00 a.m. he was seen walking in the direction of May Avenue in Fort Smith. Between 11:00 and 11:30, in a shop on May Avenue, petitioner asked for directions to Linwood Street. The directions given to petitioner would have taken him to within one block of the Joyce residence.

On that same day, Sara McCurdy left work at 11:15 a.m. to drop off her car, a 1977 Buick LaSabre, at her parents' home. It had been agreed that Mr. Joyce would take Sara back to work after lunch, but Sara never returned. Calls to the Joyce residence between 12:30 and 2:00 went unanswered. Shortly after 2:00 the victim's bodies were discovered by a relative. It was determined at that time that Sara McCurdy's car was missing.

The next time petitioner was seen was shortly before 2:00 p.m. on the same day near Pocola, Oklahoma. He was seen driving a 1977 Buick LaSabre later found abandoned near Pocola and identified as the missing vehicle belonging to Sara McCurdy.

McCurdy's vehicle was left near a service station from which petitioner obtained a ride to the Fort Smith bus station. Petitioner was seen carrying a purse matching the description of the one taken from the Joyce residence. From Fort Smith, petitioner took the bus to Little Rock. At the Little Rock bus station, petitioner attempted to sell pieces of jewelry and several silver coins to persons who testified for the State at trial and described the jewelry and coins in detail. Petitioner checked into the Downtowner Motor Inn, in Little Rock, and on December 13 pawned some of the jewelry belonging to the victims at Maxie's Pawn Shop in Little Rock.

Based upon a description of the petitioner and his activities, including that he was trying to obtain a ride back to Fort Smith, undercover Arkansas State Police officers went to the Little Rock bus station in an unmarked car and offered petitioner a ride to Fort Smith if he would agree to pay the gas. Petitioner agreed.

Petitioner was arrested in route to Fort Smith. On the same day, the jewelry pawned by petitioner was identified by Cindy Griggs as the jewelry missing from her parents' home.

On December 14, the police searched petitioner's room at the Downtowner Motor Inn in Little Rock pursuant to a warrant. The search produced several items later identified as having been taken from the Joyce home. On December 16, one of the officers returned to the Downtowner Inn and took custody of certain items not seized during the original search. These items had been removed and secured by the employees of the Downtowner Motor Inn. Among the items was the purse Gardner had been carrying near Pocola which had belonged to Mrs. Joyce.

### III. Grounds for Relief

Petitioner raises numerous grounds for relief. The court will discuss these points in the order presented by the petitioner.

## A. Petitioner's *Miranda* Rights

■ Petitioner alleges that his privilege against self-incrimination was violated because statements he made to the undercover police officers while riding in their car were introduced at trial. Petitioner does not allege otherwise, and it appears apparent from the record, that petitioner was unaware that he was speaking to undercover police officers. Admittedly, petitioner had not received his *Miranda* warnings at the time the statements were made.

■ Apparently, petitioner interprets the Constitution to forbid the admittance of statements made to undercover agents by individuals without knowledge of the agents' true identity. Petitioner's interpretation of the right against self-incrimination is terribly askew. Conversations between a suspect and undercover officers do not implicate the concerns underlying *Miranda* unless the essential elements of "police-dominated atmosphere" and compulsion are present. *Illinois v. Perkins*, 496 U.S. 292, 296–97, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990).

The court cannot construe a situation in which an unmarked automobile occupied by two undercover agents could be considered a "police-dominated atmosphere." The record fails to reflect evidence that anyone, much less the petitioner, other than the police had reason to believe that the car and its occupants were who they were. The petitioner left the vehicle on more than one occasion— once to pay for the gas and buy beer and another to urinate by the side of the road. If petitioner had suspected the vehicle's occupants were police agents, it seems unlikely that petitioner would have accepted the ride and insisted on buying the officers beer.

■ Likewise, the court is unable to find any sign of coercion on the part of the officers to elicit the comments the petitioner made. For *Miranda* purposes, coercion is determined from the perspective of the suspect. *Perkins*, 496 U.S. at 292, 110 S.Ct. at 2394.

In this case, the agents merely offered to give the petitioner a ride if he would pay for the gas. Petitioner seems to argue that the relevant coercion was present because the

officers "coaxed" the petitioner into making incriminating statements about the homicides. Petitioner does not point to which of the statements he is referring, and after reviewing the record, the court is unable to determine such. The record fails to provide any comments that petitioner made specifically about the murders of the Joyces or Sara McCurdy. Regardless, none of the conversation that was had in the unmarked car can be said to have resulted from coercion of the petitioner.

■ *Miranda* forbids coercion, not mere strategic advantage of a suspect's misplaced trust in an undercover agent. *Perkins*, 496 U.S. at 296–97, 110 S.Ct. at 2397. Ploys designed to mislead or lull a suspect into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within the concerns of *Miranda*. *Id.* A suspect's right against self-incrimination is not implicated where the suspect has no reason to feel that an undercover agent had any legal authority to force him to answer questions or that the agent could affect a suspect's future treatment. *Id.* at 297–99, 110 S.Ct. at 2398.

The purpose of the privilege against self-incrimination is to protect against an accused's compulsory self-incrimination. The Supreme Court clearly articulated this in *Hoffa v. United States*, 385 U.S. 293, 303–04, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966), where the court explained:

> [S]ince at least as long ago as 1807, when Chief Justice Marshall first gave attention to the matter in the trial of Aaron Burr, all have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion. Thus, in the *Miranda* case, dealing with the Fifth Amendment's impact upon police interrogation of persons in custody, the Court predicated its decision upon the conclusion "that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."

*Id.*, 385 U.S. at 303–04, 87 S.Ct. at 414 (citation and footnote omitted). Thus, petitioner is not entitled to the protection against self-incrimination unless he can show legal or factual coercion. *See id.* Such rights are surely not violated where the statements are made wholly voluntarily. *Id.* Therefore, introduction into evidence of petitioner's comment to the undercover law enforcement agents did not violate petitioner's Fifth Amendment privilege against self-incrimination.

### B. Search and Seizure

Petitioner bases his second claim for relief upon the search and seizure of evidence from his motel room in Little Rock. Petitioner makes two separate arguments. First, petitioner argues that the initial search of the room was unconstitutional because the warrant authorizing the search "was not based upon a valid affidavit with supporting probable cause, and did not describe with particularity and specificity the persons or place to be searched and the items to be seized." Second, petitioner claims that the subsequent search of the canvas bag without a warrant was unconstitutional.

#### 1. Validity of the Search Warrant

Petitioner's first point of error simply states that petitioner is entitled to relief because of some unnamed flaw in the initial search warrant. This mere boilerplate assertion does not equate to a valid claim that this court should research and consider. In order for a claim on a habeas petition to be sufficient, it must describe a substantial infringement of a constitutional right and include a factual statement which, if true, would entitle the petitioner to relief. *Shelton v. Ciccone,* 578 F.2d 1241, 1244 (8th Cir.1978). In seeking habeas relief, it is the petitioner who has the burden of proving that his rights have been violated. *Sargent v. Armontrout,* 841 F.2d 220, 226 (8th Cir.1988). The district court does not err by dismissing without holding an evidentiary hearing a claim based solely on vague, conclusory, or palpably incredible allegations or unsupport-

ed generalizations. *Beavers v. Lockhart,* 755 F.2d 657, 663 (8th Cir.1985).

Other than petitioner's assertion, made for the first time here on habeas review, this claim is not reflected anywhere in the record. Petitioner is procedurally barred from raising a claim for relief that has not been raised below. Petitioner may not wait until he files a federal habeas petition to fully develop his claims. *Boliek v. Bowersox,* 96 F.3d 1070, 1072–73 (8th Cir.1996).

Petitioner's Fourth Amendment rights were considered at both the trial and appellate level. He had every opportunity to raise these issues below and failed to do so. Petitioner's failure to raise the issue on appeal cannot prevent the application of the *Powell* [2] doctrine. *Brunson v. Higgins,* 708 F.2d 1353, 1361 (8th Cir.1983). For all of the reasons stated above, the court finds that the petitioner's claim has no merit.

#### 2. The Return Trip

The court cannot grant relief to petitioner based upon his second point concerning the return trip the police made to the motel. A federal court may not grant habeas relief unless it finds that the state failed to provide the petitioner with a full and fair opportunity to litigate his claim. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Petitioner's Fourth Amendment rights were considered at both the trial and appellate level. *See Gardner v. State,* 296 Ark. 41, 56, 754 S.W.2d 518 (1988). The State, therefore, provided petitioner with a full and fair hearing on this Fourth Amendment issue.

#### 3. Ineffective Assistance of Counsel

Petitioner seems to argue that he has a Fourth Amendment claim based upon his claim of ineffective assistance of counsel. It is true that the restrictions of *Powell* do not extend to Sixth Amendment ineffective assistance of counsel claims which are founded primarily on alleged incompetent representation with respect to the Fourth Amendment.

**2.** See subsection B(2) discussing *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

*Kimmelman v. Morrison,* 477 U.S. 365, 373–383, 106 S.Ct. 2574, 2581–2587, 91 L.Ed.2d 305 (1986). However, petitioner's claim of ineffective assistance of counsel is not in fact a Fourth Amendment claim. *Id.,* 477 U.S. at 374–75, 106 S.Ct. at 2582–83. As the Supreme Court explained, "the two claims are ... distinct, both in nature and in the requisite elements of proof." *Id.,* 477 U.S. at 374, 106 S.Ct. at 2582. Instead, petitioner's ineffective assistance of counsel claim will be dealt with below in section H of this opinion.

## C. Jury Composition

For his third claim for relief, petitioner raises three separate points related to the jury that convicted him. First, he claims the jury was not fair and impartial because of prejudicial pretrial publicity, and that a change of venue should have been granted. Second, he claims that certain jurors should have been removed from the panel for cause. Third, he claims that the jury panel was not a fair cross-section of the community, and that the trial judge should have quashed the jury panel. The petitioner has linked the second and third issues with a separate claim about ineffective assistance of counsel, which is addressed in section H of this opinion. However, all three of the jury issues need brief separate discussion here.

### 1. Pretrial Publicity

A criminal defendant has a federal due process right to protection from prejudicial pretrial publicity. *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Groppi v. Wisconsin,* 400 U.S. 505, 509, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971) (quoting *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)). Occasionally, publicity surrounding a trial can be so intense that the only way to ensure an impartial jury is to grant a change of venue. *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

However, a trial judge can minimize the impact of trial publicity in many ways, *Sheppard, supra,* and a change of venue is not granted just because the crime or the defendant becomes newsworthy. " '[I]t is not required that jurors be totally ignorant of the facts and issues involved.' " *Frank v. Brookhart,* 877 F.2d 671, 675 (8th Cir.1989) (quoting *Irvin, supra,* 366 U.S. at 722, 81 S.Ct. at 1642). "Mere exposure to publicity about a trial or information about a defendant is not grounds for a new trial." *Frank, supra,* at 675.

Several factors affect the decision on change of venue. In extreme cases, a court must guard against publicity that essentially puts the defendant on trial in the media. *Sheppard, supra,* and *Rideau, supra.* More commonly, the question is (1) whether the volume and depth of local media coverage of a crime subsided enough so as not to prejudice potential jurors, or (2) whether potential jurors—once exposed to publicity about a crime—can put aside their knowledge and opinions of the crime and listen only to what is presented in the courtroom. *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). "The relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.,* 467 U.S. at 1035, 104 S.Ct. at 2891 (citing *Irvin, supra,* 366 U.S. at 723, 81 S.Ct. at 1642–43).

When a federal court is reviewing a state court's determination that a jury was not prejudiced against a defendant by pretrial publicity, the state court "is entitled to deference and can be overturned only for 'manifest error.' " *Swindler v. Lockhart,* 885 F.2d 1342, 1347 (8th Cir.1989), (quoting *Yount, supra* ).

Against this framework, petitioner Gardner has the burden of showing that his right to a fair and impartial jury was tainted by the publicity generated by the Fort Smith murders. Petitioner fails to meet that burden.

Nothing in the record indicates that the news coverage related to this triple murder was remarkable in any way. At his pretrial hearing, petitioner presented six stories from

the Fort Smith newspaper, three of them published at the time of the murders in mid-1985. He also showed that Fort Smith television stations broadcast several stories in December, 1985, and again in January, 1986. The news coverage included details about the murders and the defendant, but it was neither lurid nor long-lasting. The petitioner's trial was in June, 1986, and the record does not indicate any significant pretrial publicity for several months before the trial.

The petitioner was unable to prove that the news coverage made the public in general, and the jury panel in particular, prejudiced against him. Even petitioner's own witnesses at the pretrial hearing admitted that they could give him a fair trial, even knowing the details of the charges against him. The prosecution presented other witnesses from the local community who testified either that they did not remember details about the murders, or that they could put aside anything they remembered and give the petitioner a fair trial. Each juror eventually seated at trial stated that he or she could give petitioner a fair trial.

The Arkansas Supreme Court, echoing the federal constitutional standards outlined above, found that the trial court was not in error by denying a change of venue. *Gardner v. State*, 296 Ark. 41, 754 S.W.2d 518 (1988). This court agrees with the Arkansas Supreme Court. Finding no "manifest error," the state court's decision will not be disturbed.

### 2. Other Jury Related Issues

The petitioner's other two jury-related claims are conclusory in nature and barely supported by the record or pleadings. Petitioner links these claims to his central complaint that he suffered from ineffective assistance of counsel. The claims appear to be identical to those found to be meritless by the Arkansas Supreme Court.

First, the petitioner claims that his right to a fair trial was violated by the trial judge's refusal to remove certain jurors for cause. The jurors were seated after the petitioner had exhausted all of his peremptory challenges. The jurors in question had made statements during *voir dire* that indicated they might lean toward the death penalty, if the petitioner was convicted. One of the jurors also said that he felt there must have been some basis for the petitioner's arrest. After a careful examination of the record, the Arkansas Supreme Court found no reason to believe that the jurors "could not follow the instructions of the court or set aside whatever impressions they might have and give Gardner a fair and impartial trial." *Gardner*, 296 Ark. at 62, 754 S.W.2d 518.

The state court's decision comports with federal due process, which requires that a jury "must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492 (1992) (citing *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965)). However, being impartial and indifferent does not mean a juror has no opinions about issues in the case, or about the accused. There is abundant case law on the subject of striking for cause jurors who express strong opinions for or against capital punishment. A state cannot strike jurors for cause just because the jurors have qualms about, or "might hesitate" in ordering, a verdict imposing death, *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), but it can strike for cause any jurors who would refuse under any circumstances to assess the death penalty. *Morgan, supra.* Similarly, the defense can strike for cause any juror who would automatically assess the death penalty upon conviction. *Morgan, supra.* It follows, in this case, that the defense cannot strike for cause jurors who simply may lean toward the death penalty, especially when those jurors state that they will put aside personal opinions and follow the law. *Gardner, supra.*

The petitioner's last jury claim is that his due process rights were violated because the jury did not represent a fair cross-section of his community. The Arkansas Supreme Court refused to address this issue, since the petitioner presented no evidence to support the claim either at trial or on appeal. Likewise, petitioner has presented no support for his claim. Accordingly, this court has no

way of addressing this argument. Petitioner has failed to show that his constitutional rights were violated by any aspect of the jury selection process in this case.

### D. Sufficiency of the Evidence

For petitioner's fourth claim for habeas relief, three separate points are raised about the evidence presented at trial. First, petitioner claims that the rape of Sara McCurdy was not proven as a matter of law, and thus, petitioner should not have been convicted of murder during the commission of a rape. Second, petitioner asserts that the evidence regarding a prior rape presented during the sentencing phase was insufficient. Third, petitioner argues that the conduct that petitioner was convicted of constituted one continuous criminal episode which precluded his conviction on two separate counts of murder.

#### 1. The Evidence of the Rape of McCurdy

 To decide petitioner's claim regarding the sufficiency of the evidence, the court should not rely on its own separate proceedings. Instead, in determining whether there was enough evidence for any rational jury to find guilt beyond a reasonable doubt, the court must look solely at the record of the state trial. *Moeller v. Attorney General of State of South Dakota*, 838 F.2d 309, 310 (8th Cir.1988). From this position, the court is required to give the state court's determination great deference. The question of sufficiency of the evidence is the normal function of the state courts, and federal habeas courts should rarely disagree with them. *Id.*

 In reviewing the factual determinations of the jury, the standard of review to be used by this court is rather clear. On habeas review, in determining whether enough evidence existed to justify a finding of guilt by the jury, the court must ask if viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

 Thus, it is not the duty or role of this court to second guess the jury in an attempt to determine if any alternative finding was possible. Under this standard, it is not necessary that the prosecution rule out every possible theory, but must simply prove guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2792–93. Also, the mere fact that petitioner may point to conflicting inferences in the record does not support a finding that petitioner is entitled to relief. If a federal habeas court is faced with a record of historical facts that supports conflicting inferences, the court must presume that the trier of fact resolved such conflict in favor of the prosecution, and must defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2792–93.

The Arkansas Supreme Court has already reviewed the question petitioner presents now and determined that sufficient evidence existed. *Gardner*, 296 Ark. at 66–67, 754 S.W.2d 518. As stated above, the fact that the state supreme court has found that there was sufficient evidence to support a criminal conviction is entitled to deference by the federal *habeas court*. *Wedemann v. Solem*, 826 F.2d 766, 768 (8th Cir.1987). In this case, the Arkansas Supreme Court stated that it failed "to see how [petitioner could] seriously contend that there is insufficient evidence to support the verdicts of guilt on either count of capital murder." *Gardner*, 296 Ark. at 67, 754 S.W.2d 518. The court went on to specifically consider and reiterate much of the evidence presented at trial that supported the finding that McCurdy had been murdered during or in furtherance of a rape. *Id.* This court agrees that the evidence of guilt was nothing short of overwhelming.

 The State's case against the petitioner was based on circumstantial evidence. In making the evaluation of the sufficiency of evidence sustaining a verdict, however, the court is not to treat circumstantial evidence any different than direct evidence. *Lenza v. Wyrick*, 665 F.2d 804, 812 (8th Cir.1981). A jury may convict on circumstantial evidence just as competently as one may on direct evidence. *Id.* To establish guilt, circumstantial evidence need not be conclusive nor

prove an absolute impossibility of innocence. *Id.*

■ The State provided several items of evidence supporting the rape of Sara McCurdy. In order to support the rape of Sara McCurdy, the State provided evidence that: (1) her body was found in a separate bedroom, (2) she had on blue jeans and a blouse but no panties, stockings, or shoes, (3) she was having her menstrual cycle at the time of death, (4) her shoes, panties, and pantyhose were found on the floor in a separate room along with a wet and bloody tampon, and (5) she had seminal fluid in her vagina at the time of her death.

Viewing all of this evidence in a light most favorable to the State, this court is unable to say that any rational trier of fact could not have found beyond a reasonable doubt that McCurdy was raped. Thus, sufficient evidence existed to justify petitioner's conviction of capital murder for McCurdy's death.

### 2. Sufficiency of Aggravating Circumstances

■ Petitioner's second point questioning the sufficiency of the evidence is whether there was sufficient evidence as a matter of law of his rape of Mrs. Rosetta Paetsch. Paetsch's rape, along with other factors, was introduced as an aggravating circumstance during the penalty phase of petitioner's trial.[3] The rape occurred just weeks prior to the Joyce–McCurdy murders and seemed to fit a similar *modus operandi* to what was used in those murders. The evidence introduced against petitioner during the sentencing phase relating to petitioner's guilt of the rape included: (1) a tennis shoe print found at the scene that matched a shoe found in petitioner's Little Rock motel room, (2) a ring belonging to Mr. Paetsch found on the petition-

er at the time of his arrest, (3) a "Mini–Mag" flashlight owned by the Paetsch's found in petitioner's motel room, and (4) Mr. and Mrs. Paetsch testified that the perpetrator who raped her was once called Mark by a co-conspirator.

Petitioner's sole argument that there was insufficient evidence to link him to the crime seems to be that Mrs. Paetsch could not visually identify her assailant because he wore a ski mask throughout her ordeal. However, viewing the entirety of the evidence linking petitioner to the crime, Mrs. Paetsch's visual identification seems unnecessary.

Petitioner's claim that there was insufficient evidence concerning his prior bad acts against Mrs. Paetsch has already been considered by the Arkansas Supreme Court. *Gardner,* 296 Ark. at 68–69, 754 S.W.2d 518. As noted above, the state court's finding as to sufficiency of the evidence is entitled to great deference by this court. The Arkansas Supreme Court rejected petitioner's claim.[4]

Viewing all of this evidence in a light most favorable to the State, this court is unable to say that any rational trier of fact could not have found that the state proved sufficiently that petitioner had raped Mrs. Paestch.

### 3. One Continuous Criminal Episode

■ As a final claim under this section, petitioner claims that his two separate convictions for capital murder violated the Double Jeopardy Clause because he believes his actions constituted one continuous criminal episode.

Arkansas courts have turned to Corpus Juris Secundum to explain the nature of a continuous offense as "a breach of the crimi-

---

3. In his amended complaint, petitioner alleges that the rape was the "sole aggravating circumstance upon which" he was sentenced to death. A review of the record reveals that this is patently untrue. The record reflects that the State admitted for the consideration of the jury prior convictions for violent offenses by the petitioner. Trial Transcript 2240–71. Also, the prior criminal conduct regarding the Paetschs was not limited to the rape of Mrs. Paetsch, but also kidnapping and robbery.

4. It is worth noting that petitioner was later convicted in Illinois in relation to the same acts. *Illinois v. Gardner,* 172 Ill.App.3d 763, 122 Ill. Dec. 783, 527 N.E.2d 155 (3d 1988). In fact, the appellate court found that the "evidence against the defendant was overwhelming." *Id.* 122 Ill. Dec. at 786, 527 N.E.2d at 158. Of course, in petitioner's Illinois conviction the State had the benefit of his confession to being one of the two assailants involved in the incident. *Id.* 122 Ill. Dec. at 785, 527 N.E.2d at 157.

nal law, not terminated by a single act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences." *Britt v. State,* 261 Ark. 488, 491, 549 S.W.2d 84 (1977) (quoting 22 C.J.S. 6, Crim.Law § 1). Good examples of a continuing offense include desertion and neglect to provide for family, carrying a concealed weapon, and maintaining a nuisance. *Id.* These examples demonstrate that continuous offenses are by their nature ongoing over an extended period of time and cannot be said to surround one act. The Arkansas Supreme Court has said that the test of a continuing offense is whether the same act constitutes a violation of each separate offense. *Conley v. State,* 270 Ark. 886, 891, 607 S.W.2d 328 (1980).

The Supreme Court relied on Wharton to provide perhaps the clearest test of whether conduct should be seen as continuous. The test, according to the Court, was whether the law prohibited the individual acts or the course of conduct which they comprise. *Blockburger v. United States,* 284 U.S. 299, 302, 52 S.Ct. 180, 181, 76 L.Ed. 306 (1931) (quoting Wharton's Criminal Law, 11th ed., § 34 n. 3).

Petitioner was convicted of two separate counts of capital murder. One count for the murder of Sara McCurdy and one count for the murders of Joe and Martha Joyce. Petitioner was convicted of capital murder for the death of Sara McCurdy because he strangled her to death as a means of attempting to commit or committing rape. Petitioner was convicted of capital murder for the deaths of Joe and Martha Joyce because the jury found that he murdered them both in the same criminal episode while with premeditation and deliberation attempting to kill them.

This court is unable to understand how petitioner can seriously claim that the murder of Sarah McCurdy and the murders of Joe and Martha Joyce constitute a single continuing offense. A key element of the charge involving McCurdy was the rape; however, the rape was in no way an element of the charge involving the Joyces. If the jury had found that no rape had been proven, the jury would not have been precluded from finding the defendant guilty of capital mur-

der regarding the Joyces' deaths. Also, no one can seriously argue that the law of capital murder does not mean to prohibit the individual acts as opposed to the course of conduct which they comprise.

The court does recognize that, in layman's terms, the petitioner might understand that he had murdered all three of his victims in one extended killing spree. However, the law concerning continuing offense "does not excuse a defendant for multiple crimes committed during an escapade." *Conley v. State,* 270 Ark. 886, 891, 607 S.W.2d 328 (1980).

**E. Prosecutorial Misconduct**

Petitioner's fifth claim for habeas relief relies on two different types of prosecutorial misconduct. First, the petitioner claims that the prosecution failed to disclose evidence favorable to the petitioner prior to trial. Second, the petitioner claims that the prosecuting attorney made several comments in the presence of the jury which should have warranted a mistrial. The heading to petitioner's claim on prosecutorial misconduct also includes a reference to prejudicial photographs being introduced. Although this claim is never dealt with anywhere in the brief, the court will discuss it in considering the claim discussed in this section.

1. Failure to Disclose Favorable Evidence

This court is at a loss to understand petitioner's contention that favorable evidence was not disclosed to the petitioner prior to trial. This claim is nothing more than a one sentence assertion in the petitioner's amended petition. The court was unable, in its own review of the record, to discern what evidence the petitioner may have been referring to and where, if ever, this claim had been raised before.

As outlined above, a petitioner must meet a certain level of completeness in order for him to be entitled to even a cursory review by this court. In the petition, the petitioner must (1) describe a substantial infringement of a constitutional right and include a factual statement which, if true, would entitle the petitioner to relief, *Shelton*

*v. Ciccone,* 578 F.2d 1241, 1244 (8th Cir. 1978), (2) prove that his rights have been violated, *Sargent v. Armontrout,* 841 F.2d 220, 226 (8th Cir.1988), and (3) not state a claim based solely on vague, conclusory, or palpably incredible allegations or unsupported generalizations. *Beavers v. Lockhart,* 755 F.2d 657, 663 (8th Cir.1985).

It is not the job of this court to prepare the amended petition for the petitioner—it is the responsibility of his paid, court-appointed counsel. Petitioner's amended petition and the entire record show this claim to be totally unsupported; therefore, this court will deny the claim without further consideration.

### 2. Statements by the Prosecutor

Petitioner's second claim of prosecutorial misconduct alleges that the prosecuting attorney made several comments in the presence of the jury which should have warranted a mistrial. Petitioner provides the court with only one example of such a remark in which petitioner claims that the prosecuting attorney requested that the petitioner show the tattoos he has on his forearms "to the jury."

In reality, the remark that petitioner alludes to was a request by the prosecuting attorney that the witness be able to view the petitioner's forearms for identification purposes. Transcript 1686–1688. When defense counsel objected to the display, claiming that it should have been done pretrial, the prosecuting attorney withdrew the request. The defense counsel moved for a mistrial, claiming that the statement presented to jury evidence that would have otherwise been inadmissable. *Id.* The trial court denied the motion. *Id.* at 1689. The petitioner now claims that the prosecutor's action—and the judge's refusal to declare a mistrial—violated the petitioner's Fifth Amendment protection against self-incrimination and Eighth Amendment "right to a fair trial."

### a. Petitioner's Fifth Amendment Claim

■ Petitioner's Fifth Amendment claim is without merit. The Fifth Amendment protects a criminal defendant from being compelled "to be a witness against himself. . . ."

U.S. CONST., amend. V. For nearly a century, the United States Supreme Court has made clear that the protection against self-incrimination means only that defendants cannot be forced to communicate with the prosecution. Justice Holmes gave the classic interpretation of this Fifth Amendment right in *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), when he said that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." *Id.,* 218 U.S. at 252–53, 31 S.Ct. at 6. The rule of *Holt* means that "the compelled display of identifiable physical characteristics infringes no interest protected by the privilege against compulsory self-incrimination." *United States v. Dionisio,* 410 U.S. 1, 5–6, 93 S.Ct. 764, 767, 35 L.Ed.2d 67 (1973).

■ Accordingly, criminal defendants do not suffer constitutional harm when they are required to try on clothing to see if it fits, *Holt, supra,* give a blood sample, *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), give handwriting samples, *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), or even speak so that witnesses can hear the defendant's voice quality or tone, *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). It also is well known that the Constitution does not protect criminal defendants from giving fingerprints, or standing in police lineups.

It follows then, that a criminal defendant who is asked to display tattoos suffers no constitutional harm. The Ninth Circuit Court of Appeals said exactly that in *United States v. Bay,* 762 F.2d 1314 (1984), where a defendant actually *wanted* to display his tattoos in order to raise doubts about a witness' identification. The trial court in *Bay* refused the request on the assumption that the defendant could not display the tattoos without giving up his other Fifth Amendment rights. The Ninth Circuit reversed, holding that tattoos—like other physical characteristics—are

not testimonial and do not raise Fifth Amendment concerns. *Id.* at 1315–16.

### b. Petitioner's Eighth Amendment Claim

The petitioner's claim that the request to display tattoos violated his Eighth Amendment rights is somewhat cryptic. The Eighth Amendment prohibits the assessment of excessive bail or fines, and the infliction of cruel and unusual punishment. U.S. CONST., amend. VIII. No bail or fines are involved in petitioner's case, so his Eighth Amendment claim must be a reference to cruel and unusual punishment. As such, the claim is misplaced.

 The United States Supreme Court has interpreted the Eighth Amendment's "cruel and unusual punishment" clause to apply only to post-conviction punishments, or related conditions, inflicted on defendants. "[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Ingraham v. Wright,* 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412 n. 40, 51 L.Ed.2d 711 (1977); *Graham v. Connor,* 490 U.S. 386, 392 n. 6, 109 S.Ct. 1865, 1870 n. 6, 104 L.Ed.2d 443 (1989). Accordingly, petitioner cannot raise an Eighth Amendment claim over an issue that arose prior to his conviction.

### 3. Prejudicial Photographs

In the heading to this section of the petitioner's amended petition it alludes to the introduction of prejudicial photographs at trial. The photos, however, are not discussed either in the section or elsewhere in the petition. Petitioner did argue the admissibility of photographs before the Arkansas Supreme Court, and the court soundly rejected his argument. *Gardner,* 296 Ark. at 59, 754 S.W.2d 518. Since this mere mention in the heading fails to adequately amount to a claim for which relief might be granted, the court will not give further consideration to this issue. *See Shelton v. Ciccone,* 578 F.2d 1241, 1244 (8th Cir.1978); *Sargent v. Armontrout,* 841 F.2d 220, 226 (8th Cir.1988); *Beavers v. Lockhart,* 755 F.2d 657, 663 (8th Cir.1985).

### F. Failure to Provide Pretrial Transcripts

Petitioner's sixth claim for habeas relief states that he was denied his rights to equal protection, due process and confrontation under the Constitution when the trial court denied his request for a transcript of the pretrial suppression hearing. Petitioner makes a further argument that denial of the transcript amounted to an *ex post facto* application of the law.

The petitioner was indigent and requested a copy of the pretrial transcript for impeachment purposes. At trial, counsel for the defendant renewed his request for a transcript of the pretrial suppression hearing claiming it was necessary to impeach a prosecution witness who had slightly altered her testimony. The request was again denied.

### 1. Petitioner's Right to Equal Protection and Due Process

 Denial of a pretrial transcript that is based upon the defendant's inability to pay because of his indigence is a violation of the Equal Protection Clause. *Roberts v. La-Vallee,* 389 U.S. 40, 42, 88 S.Ct. 194, 195–96, 19 L.Ed.2d 41 (1967), *Long v. District Court of Iowa,* 385 U.S. 192, 194, 87 S.Ct. 362, 364, 17 L.Ed.2d 290 (1966). However, *Roberts* and *Long* did not address the situation in which the transcript was not reasonably available. *Long,* 385 U.S. at 195, 87 S.Ct. at 364; see, *Roberts,* 389 U.S. at 42, 88 S.Ct. at 195–96.

The transcript of the pretrial hearing was not denied to the petitioner based upon the fact that he could not afford to buy one, but rather, because the court was incapable of producing one in time for trial. The trial court explained this clearly at the time of the original request. The transcript of the pretrial hearing reflects the following exchange between the court and the petitioner's two trial attorneys:

MR. KIRKPATRICK: Very briefly, I wonder if it would be possible for us to ensure that we have transcripts of these proceedings prior to trial. Can that be done?

THE COURT: No, sir.

MR. KIRKPATRICK: It cannot be done?

THE COURT: No, it cannot.

MR. VanWINKLE: Your Honor, it may be necessary for us to use some of the testimony here for impeachment purposes at trial.

THE COURT: That will not be done. It's not done in any case that I know of that we've ever had and we just don't have the facilities to do that with.

MR. VanWINKLE: Just note our exception.

MR. KIRKPATRICK: Please, Judge.

THE COURT: All right.

Transcript at 564. The record is more informative about the trial court's reasoning when the trial counsel renewed its motion for pretrial transcripts on the following day. The transcript reads:

MR. VanWINKLE: Your Honor, we would renew our motion to have the State provide us with transcripts of the pretrial hearings. We have some case authority that says the State must provide an indigent defendant with a transcript of prior proceeding when that transcript is needed for an effective defense or appeal. We would argue that we definitely need it for us to have transcripts or at least part of these pretrial proceedings, particularly, the testimony of some of the identification witnesses could be used for possible impeachment purposes at the time of trial, I don't think that would be particularly costly to the State. It could be done privately—

THE COURT: The expense is not what I'm worried about, Mr. VanWinkle, that's not—

MR. VanWINKLE: Is it the time?

THE COURT: It's just that we don't have the time. I've got other cases. My court reporter is going to be busy then. And for her to sit up and transcribe stuff all night long, she's not going to be effective in the Courtroom.

MR. VanWINKLE: Could the Court make the tapes available that we'd hire some private—

THE COURT: No, sir, this had not been done any time since I've been in office,

here, it's not been done, as far as I know, since 1971, since I've practiced law, here in this town, where we've made tapes or transcripts or anything else available, whether you could pay for it or not. It's just not been done. We just don't have the time to do that.

MR. VanWINKLE: We're not asking this court reporter to do that. If the tapes were made available, we could have it done privately. We're not asking for all the entire proceedings to be transcribed, just certain portions that we could use for impeachment purposes.

THE COURT: What says the State about this, I think it's unreasonable, myself.

[The Prosecutor]: Your Honor, I don't know of any case, where the court reporter has given official copies of transcripts to someone for private use. I don't know what that would do to the chain of evidence and I'm concerned about that. I, also, like the Court, I'm at kind of a loss in coming up with a precedent for this type of thing. I don't know of any. If there were a transcript that had been done, you know, we would furnish it to them, no questions asked. But in this case, I don't think there's any way, physically, to get a transcript of this done. I've never known the Court to order it in any case. I do know there have been times where the Defense has made motions for it and it hasn't been granted.

THE COURT: I feel that you've got all the police reports, anything you need to impeach anybody with, you have in your possession, and I think that this would just be redundant to have these transcripts transcribed.

MR. VanWINKLE: Your Honor, there's just some information that was elicited during cross-examination, that appears nowhere in the police reports. We just would like to be able to quote the witnesses, verbatim, in case there testimony varies during the trial. I'd like to be accurate if I'm trying to impeach somebody, as to exactly what they said, so I won't be in error.

[The Prosecutor]: Your Honor, I think the defense counsel has had a right to write down everything they said, impeach them from their notes.

MR. VanWINKLE: Well, Your Honor, neither Mr. Kirkpatrick nor myself take shorthand and I also don't write while I'm cross-examining somebody, so, I think that's kind of a ridiculous argument.

THE COURT: Well, I've taken notes whenever I've examined people, Mr. VanWinkle, whether or not your good·at it or not is another matter. I just feel that this is an unreasonable request and it will not be granted. If I'm wrong on it, I'm wrong on it, but I don't think I am.

Transcript at 709–711.

Petitioner's initial request for a copy of the pretrial transcript was made on the afternoon of May 20, 1986. Petitioner's trial began on Monday, June 2, 1986. The witness in question, Sandy Replogle, testified and was cross-examined on Thursday, June 5, 1986. On June 7, 1986, petitioner was convicted and sentenced to death for the murders of Joe and Martha Joyce and their daughter Sara McCurdy. The complete transcript of both pretrial and trial testimony was not completed and filed until January 9, 1987. The court is convinced that petitioner was not denied a transcript because he could not afford one, but because it was impossible for the court to provide anyone with a transcript in time for petitioner's trial.

It should be noted that, at the time petitioner's trial counsel made the request, they did not specify which, if any, witnesses they believed that they would be able to impeach if provided with a transcript. Rather, the request seems to have simply stated generally and vaguely that the transcript might be helpful if it did become necessary to impeach any identification witness's testimony at trial.

Petitioner argues that he was entitled to the transcript because he was indigent, that not having the transcript denied petitioner effective assistance of counsel, and that unavailability of the transcript denied him his right to confrontation. The Eighth Circuit has already rejected these arguments when the denial of the transcript was not based upon the defendant's indigence. *Sargent v. Armontrout*, 841 F.2d 220, 223 (8th Cir.1988).

*Sargent* provides a factual situation strikingly similar to that of the petitioner. In *Sargent*, the habeas petitioner had been convicted of murdering a police officer and sentenced to life imprisonment without the possibility of parole for fifty years. 841 F.2d at 221. Prior to his trial, Sargent requested a copy of the transcript of the trial of a codefendant in order to impeach some of the State's witnesses. *Id.* at 224. The court denied his request for a transcript, finding that the transcript could not be typed in time for trial and that ordering the transcript be provided by trial would have unduly burdened the state's judicial system and unnecessarily delayed Sargent's trial for as long as a year. *Id.* at 223.

In his habeas petition, Sargent argued that failure to provide him with a pretrial transcript denied him his equal protection and due process rights. The Eighth Circuit denied both these claims. The court held that Sargent's equal protection rights were not violated because the transcript was not available for any price to any prisoner. *Id.* The court further found that Sargent's due process rights were not violated since he had been provided an adequate opportunity to present his claims within the adversary system. *Id.*

Similar to *Sargent*, petitioner's rights to due process and equal protection were not denied to him because the reason he was unable to obtain access to a transcript was unrelated to his indigence.

### 2. Petitioner's Right to Confrontation

■ Petitioner's Confrontation Clause argument deserves separate consideration. The Confrontation Clause in the United States Constitution gives a criminal defendant the right "to be confronted with the witnesses against him...." U.S. CONST., amend. VI. The United States Supreme Court says that the right to confrontation "guarantees the defendant a *face-to-face* meeting with witnesses appearing before the trier of fact" even though there is no abso-

lute right to face the accuser. *Maryland v. Craig*, 497 U.S. 836, 844, 110 S.Ct. 3157, 3162, 111 L.Ed.2d 666 (1990) (quoting *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.*, 497 U.S. at 845, 110 S.Ct. at 3163.

Here, petitioner claims that his right to confront witnesses against him was violated by the trial court's refusal to provide him a transcript of the pretrial hearing. Nowhere, however, does petitioner claim that he was unable to meet "face-to-face" the witness in question, or to rigorously test the witness' testimony against him. In fact, as discussed in subsection 4 below, the petitioner was able not only to meet this witness in court, but also was successful in cross-examining her without a transcript. Just as that successful cross examination negated any prejudice related to the absence of a transcript, it also negated any constitutional injury under the Sixth Amendment's Confrontation Clause.

Further, the court would note that the test used in *Sargent* to determine if denial of the transcript violated due process is equally applicable to petitioner's confrontation claim. In *Sargent*, the Eighth Circuit relied on *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) to determine the due process claim. *Sargent*, 841 F.2d at 223. *Ake* lays out three factors that are to be considered in determining if an indigent has been given a fair trial. *Id.* These factors are: (1) the private interest that will be affected by the State, (2) the governmental interest that will be affected if the safeguard is provided, and (3) the probable value of the additional or substitute safeguards sought and the risk of an erroneous deprivation of those interests if such safeguards are not provided. *Id.*

Considering these factors in relation to petitioner's case leads this court to conclude that petitioner was not denied his right to confrontation. Granted, petitioner has a compelling interest at stake during the trial, given that he faced the possibility of life imprisonment or the death penalty. The court must recognize, however, that both the petitioner and the State have a strong interest in a speedy and fair resolution of the matter. Also, the courts are not unlimited in the resources available to them in the interests of justice. It must be remembered that petitioner was not without alternative methods of impeachment. If necessary, petitioner was free to call the court reporter to the stand and have the applicable portion of the pretrial hearing read into the record. *Id.* at 224. Upon balancing the interests of both the state and the petitioner in a speedy trial, the scarcity of judicial resources, alternative methods of impeachment available to the petitioner, and the slight possibility that petitioner would not be able to effectuate competent confrontation of the witness, this court finds that the unavailability of the transcript did not deny the petitioner's right to confrontation.

### 3. Petitioner's *Ex Post Facto* Claim

Petitioner claims that he was subjected to a retroactive change in case law in violation of the United States Constitution's prohibition on *ex post facto* laws. The petitioner is wrong on two fronts: an erroneous statement of Arkansas law, and a misunderstanding of the concept of *ex post facto*.

Petitioner's *ex post facto* claim is based on the Arkansas Supreme Court's abandonment of an earlier rule of law that assumed all trial errors to be prejudicial to a litigant. *See Graves v. State*, 256 Ark. 117, 505 S.W.2d 748 (1974). In his appeal to the state supreme court, the petitioner cited *Graves* in claiming that the trial court's failure to provide the petitioner a copy of the transcript prejudiced the petitioner at trial. The Arkansas Supreme Court responded by noting that it no longer followed the rule as outlined in *Graves*, and the court cited *Sutherland v. State*, 292 Ark. 103, 728 S.W.2d 496 (1987), for the proposition that harmless error would not prompt reversal of a trial court. *Gardner v. State*, 296 Ark. 41, 53–54, 754 S.W.2d 518, 523–24 (1988). In this habeas proceeding, petitioner has latched onto the timing of *Sutherland*—it was decided *after* petitioner's conviction—to claim that the state court was retroactively applying a law in violation of

petitioner's constitutional rights. However, even a cursory reading of *Sutherland* shows that the Arkansas Supreme Court changed its rule on prejudicial errors well before petitioner went to trial in 1986. *Sutherland* was based in part on *Berna v. State*, 282 Ark. 563, 670 S.W.2d 434 (1984), which clearly held that "[n]o longer is it presumed that simply because an error is committed it is prejudicial error." *Berna*, 282 Ark. at 565, 670 S.W.2d 434. *Berna*, in turn, cited even earlier cases. *See Walton v. State*, 279 Ark. 193, 650 S.W.2d 231 (1983); *Huckaby v. State*, 262 Ark. 413, 557 S.W.2d 875 (1977). In other words, the state supreme court had stopped presuming trial errors to be prejudicial at least two years before petitioner's trial, so the petitioner suffered no retroactive application of law on this point.

■ The court need not conduct a significant *ex post facto* analysis; however, another of the petitioner's misconceptions should be cleared up. The United States Constitution bars states from passing *ex post facto* laws. U.S. CONST., Art. I, § 10. The United States Supreme Court has always held that this prohibition "applies only to penal *statutes* which disadvantage the offender affected by them." *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990) (emphasis added) (citing the classic case on *ex post facto, Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390–92, 1 L.Ed. 648 (1798) (opinion of Chase, J.)). The ban on *ex post facto* laws means that "*[l]egislatures* may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins*, 497 U.S. at 43, 110 S.Ct. at 2719 (emphasis added). In other words, the *ex post facto* clause in the Constitution refers to statutory laws, and the ability of state legislatures to apply those laws retroactively. It does not apply to a state court's common law decisions.

4. Harmless Error

■ Even if it were true that petitioner had been denied a pretrial transcript because of his indigence, the court believes that the proper action to be taken would not include automatic reversal of the petitioner's conviction or sentence. Instead, the court believes that the proper action for this court to take if such a finding were made would be to further investigate the record to determine if the failure to provide access to the transcript actually prejudiced the petitioner at trial or if it was mere harmless error. *Roberts*, 389 U.S. at 44, 88 S.Ct. at 197. (Harlan, J. dissenting). A constitutional error at trial level is subject to the harmless error analysis so long as it is a mere trial error and does not rise to the level of a defect abrogating the constitutional structure of the trial. *Starr v. Lockhart*, 23 F.3d 1280, 1291 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994). Denial of a pretrial transcript does not rise to the level of error that excludes harmless error review. *See id.* Under the circumstances in this case, the standard of review for harmless error is whether the error had a substantial or injurious effect or influence in determining the jury's verdict. *See id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–39, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)).

The basic thrust of petitioner's argument is that denial of the transcript prejudiced his defense by not allowing him to effectively cross-examine the testimony of Sandy Replogle. Replogle testified to seeing petitioner driving Sara McCurdy's car, shortly after the time of the murders, near the location that the car was abandoned. After closely reviewing both the pretrial hearing and the trial transcript, the court has to disagree with the petitioner.

Replogle testified at the pretrial hearing that she had been driving behind the petitioner when he made a dangerous U-turn. Transcript 421–422. At the pretrial hearing, she testified for the state that she got a pretty good look at the driver. *Id.* at 422. She also testified that she identified the defendant as the driver in a photo line-up, and in the courtroom identified the defendant as the driver. *Id.* at 422–24.

During the pretrial hearing, Replogle was thoroughly cross-examined by petitioner's trial counsel. She stated during cross that, when she passed the petitioner, she had "looked real good at him." *Id.* at 430. Trial counsel was able on cross-examination to get

Replogle to admit that she had only seen the petitioner for a second or two and that it was from a sideview. *Id.* at 431. Replogle also admitted on cross that she was unsure if the other driver had any facial hair. *Id.* at 432–433.

At trial Replogle altered her testimony slightly from the pretrial hearing. On direct she testified, in reference to the petitioner, that she "glanced at the front of him, and then I got a side view." Transcript at 1647. On cross-examination at trial Replogle admitted that she had testified at pretrial that she had only a side view. She also stated on cross examination that she looked at the petitioner because of the manner that he was driving, he was "a nervous wreck." *Id.* at 1652. Trial counsel then got her to admit that she had never previously said anything about observing his apparent mannerisms. *Id.* Then Replogle appeared to deny testifying at the pretrial that she had only looked at the petitioner from the side. *Id.* at 1652–53. At this point, petitioner's trial counsel requested that a transcript of the witness' pretrial testimony be ordered and that petitioner be allowed to recall the witness for impeachment purposes. *Id.* at 1653.

After petitioner's request for the transcript was denied, petitioner's trial counsel went on to effectively draw out the inconsistencies in Replogle's pretrial and trial testimony. Replogle admitted that it was possible she had testified differently earlier. *Id.* at 1654. Replogle also admitted to not knowing if she had ever provided the information about seeing a front view of petitioner's face. *Id.* at 1655. Later on cross, Replogle stated that it was fair to say that she only got a glance of the petitioner for a split second or so mainly from the side. *Id.* at 1655–1656. The trial judge stated at the time that he thought that the trial counsel had effectively cross-examined Replogle without a transcript. *Id.* at 1666.

Under the circumstances presented in this case, the court finds that, even if petitioner could demonstrate that he was denied a transcript of the pretrial hearing due to his indigence, petitioner would still not be entitled to relief. It is clear to the court, after reviewing the cross-examination of the witness in

question by petitioner's trial counsel, that denial of the transcript did not have a substantial or injurious effect or influence in determining the jury's verdict.

5. Petitioner's Eighth Amendment Claim

Petitioner also indicates in the heading to this section that he is claiming that denial of the transcript violated his rights under the Eighth Amendment. For the same reasons as discussed in section E(2)(b), this assertion make no sense to the court. Further, since it is merely mentioned in the heading to the section, but in no way addressed or discussed in the brief itself, the court will deny it without further consideration. *See Sargent v. Armontrout,* 841 F.2d 220, 226 (8th Cir. 1988); *Beavers v. Lockhart,* 755 F.2d 657, 663 (8th Cir.1985); *Shelton v. Ciccone,* 578 F.2d 1241, 1244 (8th Cir.1978).

## G. Criminal Activities From Another Jurisdiction

■ Petitioner's seventh claim for habeas relief is based upon the use of what were, at the time, alleged prior violent felonies introduced in the penalty phase of the trial. The court is unclear if petitioner is presenting two distinct points of contention under this ground for relief as the State believes; however, to assure all of petitioner's claims are considered, the court is willing to assume such to be the case. Petitioner seems to be arguing that (1) it was unconstitutional to introduce evidence of petitioner's commission of prior felonies to which the petitioner had not yet been convicted, and (2) the same introduction was unconstitutional because the criminal charges stemming from such acts were later dismissed.

The evidence in question was the State's proof that Gardner had committed the felonies of rape, kidnapping, and robbery against a husband and wife in Illinois just weeks prior to the murders in the present case. As to the latter of the points of contention, the petitioner's counsel has recognized that he was in error about the dismissal of the charges which were instead affirmed on appeal. Transcript of Proceedings Before the Hon. George Howard, Jr., on September 10, 1992, at 112. Upon recognition of his error,

counsel for petitioner orally withdrew the claim as it relates to the charges being dismissed; *id.,* thus, the court will not further consider this point.

The petitioner, arguably, raises the point of whether the State should have been able to introduce evidence during the sentencing phase of the petitioner's prior commission of felonies of which he had yet to be convicted. It should be understood that the Arkansas Legislature has clearly given the authority for the introduction of such evidence. The Arkansas Legislature did not hide its intentions when it drafted the law allowing such evidence into the penalty phase, but instead, it "made it plain that the State can offer evidence that a defendant 'committed' another crime which involves an element of violence." *Miller v. State,* 280 Ark. 551, 554, 660 S.W.2d 163 (1983).

The Eighth Circuit has already held that evidence that a defendant had committed other unadjudicated crimes is admissible in the penalty phase of a capital case. *Gilmore v. Armontrout,* 861 F.2d 1061, 1073 (8th Cir. 1988). The evidence is allowed because the scope of evidence allowed during the penalty phase is extremely large. In *Gilmore,* the Eighth Circuit upheld the admission into evidence of a videotaped confession in which the defendant admitted to killing an elderly couple. *Id.* at 1071–73. The Court of Appeals explained:

> As a matter of federal constitutional law, the trial court committed no error in allowing the introduction of the confession. The Supreme Court has held that a wide scope of evidence and argument is admissable during the penalty phase of a capital murder trial, provided that such evidence is not "constitutionally impermissible or totally irrelevant to the sentencing process." This broad use of evidence has been sanctioned because it helps prevent arbitrary and capricious imposition of the death penalty by channelling the jury to focus upon "each individual homicide and individual defendant," and because it is "desirable for the jury to have as much information as possible when it makes the sentencing decision." ... [A]lthough we recognize that adverse evidence is always somewhat prej-

udicial, we cannot say that the admission of [the defendant's] confession was impermissibly so.

*Id.* at 1073 (citations omitted).

The Eighth Circuit is not alone in its reasoning for allowing the introduction of evidence of the commission of other crimes. In *Williams v. Lynaugh,* 814 F.2d 205 (5th Cir. 1987), the Fifth Circuit provided several reasons for the introduction of such evidence. It explained that: (1) the extraneous unadjudicated offense was not allowed to be introduced until after the guilt phase had been completed in order to eliminate improper influence, (2) the focus of the capital sentencing procedure is on having all relevant information in front of the jury, and (3) such evidence was clearly relevant to the question of probability of future violent acts. *Id.* at 207–208.

### H. Ineffective Assistance of Counsel

 Petitioner's next claim for habeas relief is that he was denied effective assistance of counsel because of the performance of his court appointed trial and appellate counsel. Petitioner failed to raise the issue of ineffective assistance of counsel in any manner until the filing of his habeas petition. The issue was not raised on his motion for a new trial, his direct appeal to the Arkansas Supreme Court, or his Rule 37 petition to the Arkansas Supreme Court where he was represented by the same counsel he has in the present proceedings.

Over the State's objections, petitioner has to date, over the span of more than three years, had three separate habeas hearings on the question of ineffective assistance of counsel. This court, however, finds that it must deny petitioner's claim without further consideration.

 There are two separate situations which would entitle a petitioner to a habeas hearing on an issue that was not raised in state court. First, petitioner is entitled to an evidentiary hearing if he can show cause for his failure to develop the facts in state court proceedings and actual prejudice resulting from such failure. *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 11–13, 112 S.Ct. 1715,

1721, 118 L.Ed.2d 318 (1992). Second, petitioner is entitled to an evidentiary hearing if petitioner can show that a fundamental miscarriage of justice would result from the failure to hold a federal evidentiary hearing. *Id.* The purpose of the exhaustion requirement is to channel claims into an appropriate forum and not simply to create a procedural hurdle to achieving habeas relief. *Keeney,* 504 U.S. at 9–11, 112 S.Ct. at 1720. Petitioner, however, has failed to state a legitimate cause for his failure to raise his ineffective assistance of counsel claim until his habeas petition.

■ Petitioner may not wait until he files a federal habeas petition to fully develop his claims. *Boliek v. Bowersox,* 96 F.3d 1070, 1072–73 (8th Cir.1996). A petitioner is procedurally barred from raising claims of ineffective assistance of counsel in a habeas case where he did not raise the issue in state court post-conviction proceedings or attempt to raise them in any other way before the federal habeas petition. *Id.* at 1071–72.

In *Boliek,* also a death sentence case alleging ineffective assistance of counsel, the claim was that the procedural bar should not preclude issues being raised which were undiscovered at the time of the state appellate process. *Boliek,* 96 F.3d at 1072. The Eighth Circuit Court of Appeals disagreed, saying that "[t]here has to be a time when issues, including claims of ineffectiveness of counsel, are fully investigated and argued. That time is in the state post-conviction proceeding." *Id.*

■ The Eighth Circuit has already determined that ineffective assistance of counsel cannot be the cause to which petitioner must point. In other words, ineffective assistance of counsel cannot be cause to avoid the procedural default that arises when a petitioner fails to raise grounds for relief for the first time until his habeas petition. *Boliek,* 96 F.3d at 1073.

The court would point out that petitioner did not appear to feel that the assistance he received was ineffective until this late stage. Petitioner never made any allegation of ineffective assistance of counsel to his initial appellate counsel. Transcript of Proceedings

Before the Honorable George Howard, Jr. on September 10, 1992 at 224. Also just minutes after the jury had returned with the petitioner's sentence of death, petitioner sought to voluntarily praise his trial counsel. The record reflects the following exchange:

> [Petitioner]: There's one thing I would like to state for the record, Your Honor.
>
> THE COURT: All right sir.
>
> [Petitioner]: Mr. VanWinkle and Mr. Kirkpatrick, both, this is just for the purposes of the record, I am very pleased with what they have done as far as, you know, defending me, I feel, as I stated before, that they have went above and beyond their call of duty in representing me, preparing the defense, and I'm very pleased with them.

Trial Transcript 2369–70.

## I. Arkansas Supreme Court's Duty to Search Record

Petitioner's ninth claim for federal habeas relief is that the Arkansas Supreme Court failed to search the record to find any errors not raised below and failed to perform comparative review of the petitioner's sentence. The petitioner offers no proof that the Arkansas Supreme Court failed to perform its functions properly other then the fact that he "knows of no capital case which has been reversed by the Arkansas Supreme Court" on either ground.

Petitioner's claim is all too conclusory and lacks any supporting evidence. The court should properly dismiss the claim since it fails to meet the threshold necessary for review. *See Shelton v. Ciccone,* 578 F.2d 1241, 1244 (8th Cir.1978); *Sargent v. Armontrout,* 841 F.2d 220, 226 (8th Cir.1988); *Beavers v. Lockhart,* 755 F.2d 657, 663 (8th Cir.1985). However, the court will set aside this flaw in the petitioner's argument long enough to consider the merits of. the claim.

### 1. Reviewing the Record

Petitioner cites Arkansas court and procedural rules that require the Arkansas Supreme Court to review death-sentence appeals "to determine any errors prejudicial to an appellant." *Pet.'s First Amended Pet. for*

*a Writ of Habeas Corpus,* at 17 (citing former Ark.R.Cr.P. 36.24, codified after Jan. 1, 1996, as Ark.R. of App.P. 14; and former Ark.Sup.Ct.Rule 11(f), codified after May 1, 1993, as Ark.Sup.Ct.Rule 4–3(h)). Petitioner appears to believe that the Arkansas Supreme Court must consider potential trial errors not raised on appeal by the appellant. Based on this belief, the petitioner states that the Arkansas Supreme Court's failure to overturn any death sentences upon such a "self-searching review" of the record shows that the court is not doing a meaningful review of death sentence cases. Before attempting to address that claim, this court briefly must clear up the petitioner's apparent misunderstanding of the standard of appellate review applied by the Arkansas Supreme Court to cases of this type.

The Arkansas Supreme Court is required under state law to "review all errors prejudicial to the rights of the appellant" in a case where a death sentence is imposed. Ark. Code Ann. § 16–91–113 (1987). This obligation is implemented through court procedure as outlined in Rule 14 of the Arkansas Rules of Appellate Procedure and Arkansas Supreme Court Rule 4–3(h). However, to perform this duty, the court still requires an appellant to "abstract all rulings adverse to him or her made by the trial court on all objections, motions and requests made by either party, together with such parts of the record as are needed for an understanding of each adverse ruling." Ark.Sup.Ct.Rule 4–3(h) (establishing rules for briefs in criminal cases). The state attorney general, as appellee, has the duty of double-checking an appellant's work to make sure all rulings adverse to the appellant are abstracted and briefed. *Id.*

■ The Arkansas Supreme Court has noted repeatedly that its obligation to review the entire record in a capital case "presupposes that an objection was made at trial." *Withers v. State,* 308 Ark. 507, 511, 825 S.W.2d 819 (1992). While the court acknowledges its special duties in capital appeals, "[e]ven then we search only for rulings on objections and motions which were adverse to the appellant." *Kitchen v. State,* 271 Ark. 1, 17, 607 S.W.2d 345, 355 (1980). *See also*

*Ruiz v. Norris,* 868 F.Supp. 1471, 1555–56 (E.D.Ark.1994) (surveying Arkansas law and procedure on death-sentence appeals), *aff'd,* 71 F.3d 1404 (8th Cir.1995). In other words, even in capital cases, the Arkansas Supreme Court does not read every page of a trial record in search of errors prejudicial to the appellant. The state court requires an appellant to have taken some action at trial to protect himself against perceived prejudice, and to point out those actions in the appeal. The Arkansas Supreme Court is the authoritative voice on Arkansas law, and this court "must defer to the Arkansas Supreme Court's interpretation of state law unless inconsistent with constitutional law." *Ruiz, supra,* at 1556 (considering claim on appellate review identical to the one in this case).

■ Petitioner would have this court apply an entirely different appellate review procedure to capital cases in Arkansas. The petitioner notes that the Arkansas Supreme Court has not reversed any death sentences "on any error not raised by the appellant." *Pet.'s Amended Pet.,* at 17. As noted above, there is no requirement that the Arkansas court ever *consider* errors not raised by the appellant, since it is the appellant's obligation to point out those errors at trial and on appeal. The court would note that it found several cases in which the Arkansas Supreme Court reviewed the record for any error not raised that would warrant reversal. *See, e.g., Williams,* 321 Ark. at 353, 902 S.W.2d 767; *Henry v. State,* 278 Ark. 478, 647 S.W.2d 419 (1983). Accordingly, the petitioner's claim is without legal merit.

2. Comparative Review

■ Comparative review is a valid part of the appellate death penalty process in Arkansas. The Arkansas Supreme Court has committed itself to comparative review of death sentences in order to assure even handedness in its application. *Wilson v. State,* 295 Ark. 682, 689, 751 S.W.2d 734 (1988).

Petitioner's only proof that the Arkansas Supreme Court failed to perform the required comparative review in his appeal is his understanding that the court has never overturned such a sentence through such review. Petitioner seems to be misinformed about the

case law in Arkansas on this point. The Arkansas Supreme Court, on the basis of comparative review, has reversed the sentencing phase of a death sentence and reduced the punishment accordingly. *Henry v. State,* 278 Ark. 478, 488–89, 647 S.W.2d 419 (1983); *Sumlin v. State,* 273 Ark. 185, 190, 617 S.W.2d 372 (1981).

Petitioner should be reminded that, under Arkansas law, comparative review is not constitutionally mandated in every case where the death sentence is imposed. *Williams v. State,* 321 Ark. 344, 352, 902 S.W.2d 767 (1995) (relying on *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)). The court notes in this case the petitioner was provided with safeguards against arbitrariness in that his trial was bifurcated into a guilt stage and a punishment stage and the opportunity was provided in the latter for both aggravating and mitigating evidence to be provided. *Id.*

■■■ The court cannot draw any conclusion from the fact that so few death sentences have been overturned by the Arkansas Supreme Court based upon comparative review. First, since the death sentence is rarely given, relatively few death penalty sentences come before the state supreme court for review. Second, the current structure of death penalty sentencing may have left the docket with few to no cases warranting reversal. As the Arkansas Supreme Court itself noted:

> If the law limiting the death penalty to cases in which the jury finds, based upon sufficient evidence, that aggravating circumstances exist, that they outweigh mitigating circumstances, and that they compose a sufficient basis to apply the death penalty, then perhaps our comparative review of death sentences will result in no reversals whatsoever.

*Wilson v. State,* 295 Ark. 682, 689, 751 S.W.2d 734 (1988). Third, in a federal habeas proceeding, the federal court should not interfere with the State's proportionality review unless the petitioner can show that the imposition of the death penalty in his particular case "shocks the conscience," *Kordenbrock v. Scroggy,* 680 F.Supp. 867, 899 (E.D.Ky.1988), *rev'd on other grounds,* 919

F.2d 1091 (6th Cir.1990), and such is not the case with petitioner's sentence.

### J. Consideration by the Jury of Pecuniary Gain

■■■ Petitioner argues that the jury's consideration of pecuniary gain as both an element of the offense of capital murder and an aggravating circumstances considered in the penalty phase amounts to unconstitutional "double counting" in violation of the Eighth Amendment.

There is some question as to whether this issue should even be considered since, as petitioner notes, the jury did not find "pecuniary gain" as an aggravating circumstance in this case. Petitioner argues, however, that the issue was submitted to the jury for its consideration and, thus, he is entitled to relief. The court will ignore this possible stumbling block for the petitioner because it believes that the question is easily answered on other grounds.

The petitioner relies on *Collins v. Lockhart,* 754 F.2d 258 258 (8th Cir.1985), and its progeny to support his argument against double counting. Petitioner argues that the State is incorrect in asserting that *Collins* has been overruled, as applied to this case, by the Supreme Court's ruling in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

The Eighth Circuit has already clearly announced that *Lowenfield* overruled *Collins.* *Perry v. Lockhart,* 871 F.2d 1384 (8th Cir. 1989); *Singleton v. Lockhart,* 871 F.2d 1395, 1401 (8th Cir.1989). *Perry and Singleton* make it clear that Arkansas' death penalty structure does not violate the Eighth Amendment. Accordingly, petitioner's double jeopardy rights were not violated by the introduction of pecuniary gain.

### K. Jury Instruction

■■■ Petitioner's final claim for relief arose from a March 22, 1995, Motion to Supplement Brief and addresses the jury instructions given at petitioner's trial. Petitioner alleges that the instructions violated the petitioner's rights under the Eighth and Fourteenth Amendments because he believes

they constrained the mitigating circumstances that the jury could consider in sentencing, therefore creating an automatic death sentence. Petitioner argues that the issue has been "raised indirectly in this proceeding and needs to be raised with specificity so as to be squarely within this Court's jurisdiction."

After a careful review of the entire record, the court finds that the issue petitioner presents regarding jury instructions is entirely new. His claim that the issue had been "indirectly" raised is completely without merit.

As stated above, petitioner may not wait until he files a federal habeas petition to fully develop his claims. *Boliek,* at 1072–1073. Thus, petitioner's claim about jury instructions will be denied without further consideration.

## IV. Conclusion

For all of the reasons stated above, this court feels that the petition must rightfully be dismissed. The court, however, would neglect its duty if it failed to point out a few shortcomings in the handling of this entire petition.

First, as too often is the case, petitioner's claims were made in a manner counterproductive to the interests of justice. While "[i]t is natural that counsel for the condemned in a capital case should lay hold of every ground which ... might tend to the advantage of their client," it also is true that "the administration of justice ought not to be interfered with on mere pretexts." *Lambert v. Barrett,* 159 U.S. 660, 662, 16 S.Ct. 135, 135, 40 L.Ed. 296 (1895) (quoted in *Barefoot v. Estelle,* 463 U.S. 880, 888, 103 S.Ct. 3383, 3392, 77 L.Ed.2d 1090 (1983)). This court feels, after careful review of petitioner's various claims, that the bulk of those claims are meritless, generally unsupported by the facts or case law, or undeveloped beyond a passing reference in the petition for habeas corpus.

The court recognizes that the finality of the death sentence demands that every effort be made by the defense in order to insure a just result. However, when a petition is simply a litany of every conceivable constitu-

tional argument—whether or not supported by the facts, the case law, or the Constitution—then the petition simply hinders the administration of justice by placing an undue burden on judicial resources, clouding the issues for adjudication, and delaying the fair resolution of the case. Instead, petitioner would be better served if his petition simply focused the court on only those claims which truly deserve habeas review. The death row inmate who has valid claims that his conviction or sentence should be overturned should prefer to have those claims considered as quickly and efficiently as possible.

Second, the glacial pace that the petition has taken through the courts is utterly dissatisfying. Petitioner was convicted and sentenced to death on June 7, 1986, for committing three savage and callous murders. Even after one intervention by the federal courts, the Arkansas Supreme Court completed its review of the petitioner's appeals on February 3, 1989. The federal courts took up petitioner's claims for consideration on February 16, 1989, and they have languished ever since. There is patently something wrong with the "system" since we are still arguing about defendant's quilt or innocence on the eleventh anniversary of the brutal murders of three innocent citizens.

There could be no better poster child than this case supporting the passage of the Anti–Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. §§ 2241–2255 & 2261–2266 [the "Act"]. As noted above, the Act included measures designed to streamline the handling of habeas petitions by requiring prioritization, setting rigid time limits, and limiting a federal court's ability to review, hear, or grant relief on certain claims. It is unfortunate and ironic that the efforts of those wishing to prevent the death penalty from being administered have provided persuasive evidence which justifies tieing the hands of federal courts which might otherwise be able to prevent its unjust use.

The mind of the writer of this opinion harbors many conflicting thoughts and uncertainties about the death penalty, and has many ethical, moral, and practical questions that it has not sought to answer—probably because they are so "tough" and because it

has not been necessary to do so in this writer's professional or personal life. If asked to vote on society's use of this punishment, this writer cannot say if he could or would vote in support of its use. However, the duty and obligation of this court is not to ponder its own philosophical dwellings, but instead to judiciously carry out the law as prescribed by the Arkansas Legislature, the United States Congress, the Supreme Court, and the United States Constitution.

Since receiving this matter, this court has carefully reviewed (1) the prior habeas pleadings and hearings, both testimony and exhibits; (2) the state court opinions relating to this case; and (3) the trial transcript. Now, nearly eleven years to the date of the murders of Joe and Martha Joyce and their daughter Sara, this court finds that petitioner's claims are without merit and the petition is hereby dismissed with prejudice.

A separate order in accordance herewith will be concurrently entered.